## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES *EX REL* GEORDIE SANBORN, | **FILED UNDER SEAL** |
| *Plaintiff,* | |
| v. | No. |
| ATHENAHEALTH, INC. AND JOHN DOES 1-10, | **JURY TRIAL DEMANDED** |
| *Defendants.* | |
| (**DO NOT SERVE**) | SEALED |

## COMPLAINT

Relator Geordie Sanborn ("Relator"), on behalf of the United States of America (the "United States" or the "Goverment"), for his Complaint against defendants athenahealth Inc. ("Athena") and John Does 1-10 (collectively, "Defendants") alleges upon personal knowledge, relevant documents, and information and belief as follows:

1.      This is an action brought by Relator on behalf of the United States against Defendants under the qui tam provisions of the False Claims Act, 31 U.S.C. § 3729 et seq. (the "FCA"), to recover damages and civil penalties arising from false records, statements, and claims made and caused to be made by Athena and its agents in connection with the sale, marketing, and implementation of its electronic health record ("EHR") technology.

2.      This action seeks to recover damages for false claims arising from Defendants' violations of 42 U.S.C. § 1320a-7b (the "Anti-Kickback Statute" or

"AKS") in connection with Defendants' marketing and sale of EHR technology. This action also seeks to recover damages sustained by the United States in connection with payments improperly made pursuant to EHR incentive payment programs, including those established by the Health Information Technology for Economic and Clinical Health Act, Title XIII of Division A and Title IV of Division B of the American Recovery and Reinvestment Act of 2009 (Pub. L. 111-5) (the "HITECH Act"), and penalties that should have reduced the amount of certain Medicare claims.

3.      In order to sell Athena's EHR services, Defendants have upon information and belief improperly provided remuneration to health care providers in violation of the AKS.

4.      Defendants have violated the AKS through, among other things, a "client referral incentive program," pursuant to which Athena's customers have been paid up to $3,000 per physician for referrals of new EHR customers.

5.      Defendants have upon information and belief additionally violated the AKS by providing other gratuities and incentives to induce sales of Athena's EHR services, including premium sporting tickets, casino poker chips, travel, hotel accommodations, and meals.

6.      Athena's incentives were provided and offered to acquire and/or retain health care providers as customers. These health care providers then upon information and belief sought payment under federal health care programs, including Medicare and Medicaid. See 42 U.S.C. 1320a-7b(b).

2

7.      Additionally, the EHR technology that Defendants marketed and sold has upon information and belief failed to comply with applicable certification criteria. Among its most significant flaws, Athena's EHR technology:

      a.     Has been incapable of accurately transmitting consolidated-clinical document architecture data ("C-CDA") from one health care provider to another or from one health care provider to a patient;

      b.     Has repeatedly frozen, crashed, or operated so slowly that it has become inoperable, impairing its use and functionality; and

      c.     Has deleted patient data and failed to accurately input patient data.

8.      Upon information and belief, Defendants have falsely represented to health care providers and to the United States that Athena's EHR technology has complied with applicable certification requirements, and Defendants have concealed fundamental defects with that technology.  In so doing, Defendants have caused thousands of users who have purchased Athena's EHR technology to submit false claims for incentive payments.  Defendants have also enabled users to avoid penalties that should have applied to Medicare claims.  The defects in Athena's EHR technology not only violate applicable certification requirements, but also create a material risk to patient health and safety.

9.      In performing the acts and omissions set out in this pleading, Defendants knowingly caused to be presented a series of false claims for payment to the damage of the U.S. Treasury.[1]

I.   **PARTIES**

A.   **Relator**

10.      Relator is a resident of Massachusetts who has substantial knowledge and expertise in the EHR technology field.

11.      Relator has worked in the EHR technology field for over ten years and currently serves as a team lead in business development and sales for one of the nation's largest providers of EHR services.

12.      Through his work, Relator has acquired significant knowledge and a detailed understanding of EHR technology, and has helped facilitate the implementation of EHR systems by thousands of health care providers in Massachusetts and other states.

13.      Relator has obtained a detailed understanding of Athena's marketing efforts and EHR technology as the result of his work, and has extensively communicated with current and former users of Athena's EHR services about Athena's marketing and EHR technology.

14.      Relator brings this action on behalf of the United States, the real party in interest.

---

[1] As used in this Complaint, the terms "knowing" and "knowingly" are used as defined by 31 U.S.C. § 3729(b)(1).

**B.    Defendants**

15.    Athena is a publicly traded information technology company specializing in the provision of health care services with 2016 revenue exceeding $1 billion.

16.    Athena designs and sells EHR and practice-management services to physician practices and health systems.

17.    As of August 2016, Athena was one of the nation's largest providers of EHR services, and controlled a significant percentage of the EHR market.[2]  Athena represents on its public website that its EHR systems are used by 100,000 users.

18.    Because Athena provides near-identical EHR technology to all of its customers, EHR technological deficiencies experienced by an individual customer are present across Athena's network.[3]

19.    Athena's marketing of its EHR technology includes a guarantee that its technology will qualify customers for incentive payments from the United States. As Athena's CEO has noted, "the guarantee for us is that our clients will get paid their HITECH bonuses.  Everything involved with that is part of the deal."[4]

---

[2] See Medscape EHR Report 2016, available at http://www.medscape.com/features/slideshow/public/ehr2016#page=7 (last visited October 9, 2017).

[3] See The Meaningful Use Guarantee, available at https://www.youtube.com/watch?v=5ONl6jofKF8 (last visited October 9, 2017) (noting that "we can guarantee that every single customer of ours is using the same version.").

[4] See The Meaningful Use Guarantee, available at https://www.youtube.com/watch?v=5ONl6jofKF8 (last visited October 9, 2017).  Athena's CEO has further stated that "[t]he ambitiousness of [Athena's Meaningful Use guarantee] points up the fact that we are fiduciaries.  We are in the business of being medical groups' most trusted business service."  Id.

According to Athena's own data, since 2011 Athena's customers have received $424 million in incentive payments.[5]

20.     Athena advertises that its EHR technology is certified, and has represented that its EHR technology is certified in public disclosures.[6]

21.     Relator is presently unaware of the identities of the individuals or entities responsible for the acts and omissions described in this Complaint. These individuals are referred to herein as John Does 1-10.

## II.     JURISDICTION AND VENUE

22.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and 31 U.S.C. § 3732. 31 U.S.C. § 3732 confers jurisdiction on this Court in connection with actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

23.     Because Athena transacts business from this District and is headquartered in this District, and because Defendants have upon information and belief caused the submission of false claims from this District, this Court has personal jurisdiction over Defendants and venue is appropriate pursuant to 31 U.S.C. § 3732(a).

---

[5] See "We help you get every quality care dollar," available at https://www.athenahealth.com/industry-solutions/value-based-reimbursement (last visited October 9, 2017).

[6] See, e.g., ONC Health IT Transparency Disclosure, available at https://www.athenahealth.com/~/media/athenaweb/files/pdf/athenaclinicals_ambula tory_complete_certification_final.pdf (last visited October 9, 2017) ("This [EHR Technology] is 2014 Edition compliant and has been certified by an ONC-ACB in accordance with the applicable certification criteria adopted by the Secretary of Health and Human Services.").

24.     This action is not precluded by any provision of the False Claims Act's jurisdictional bar.

25.     There have been no statutorily relevant public discloses of the "allegations or transactions" described in this Complaint.

26.     Contemporaneously with the filing of this Complaint, Relator has, pursuant to 31 U.S.C. § 3730(b)(2), served a copy of the Complaint and a written disclosure of substantially all material evidence and information that Relator possesses upon the United States.

## III.   THE FALSE CLAIMS ACT AND THE ANTI-KICKBACK STATUTE

### A.     The False Claims Act

27.     The FCA was originally enacted in 1863, and was substantially amended in 1986 by the False Claims Amendments Act. The FCA prohibits, among other things, (1) knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval; and (2) knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim. 31 U.S.C. §§ 3729(a)(l)(A),(B).

28.     In 2009, Congress amended the FCA to clarify that a "claim" includes "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest[.]" 31 U.S.C. § 3729(b)(2).

7

29.     The FCA does not require a showing of specific intent to defraud. Id. at § 3729(b)(l)(B).

30.     The FCA allows any person with information about an FCA violation (i.e., a relator) to bring an action in the name of the United States. Id. at § 3730(b)(1).

### B.     The Anti-Kickback Statute

31.     The AKS was originally enacted in 1972. It bars remuneration offered or paid to induce referrals or purchases of health care items and services paid for by the Government. 42 U.S.C. § 1320a-7b(b).

32.     Violations of the AKS "constitute[ ] a false or fraudulent claim for the purposes of [the FCA]." 42 U.S.C. § 1320A-7b(g).

33.     A violation of the AKS occurs when a person "knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person" in order to induce that person to:

> (A)     [R]efer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

> (B)     [P]urchase, lease, order or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

42 U.S.C. § 1320a-7b(b).

8

34.    Specific intent to violate the AKS is not required in order to find a willful violation of the statute.  42 U.S.C. § 1320a-7b(h).  It is irrelevant whether a service provider offers remuneration for the sole purpose of inducing referrals.

35.    Because compliance with the AKS is a condition of payment for any claim submitted to a federal health care program, liability under the FCA can be predicated on a violation of the AKS.

## IV.  EHR TECHNOLOGY AND FEDERAL EHR INCENTIVE PROGRAMS

### A.    Properly functioning EHR technology improves patient outcomes and decreases heath care costs.

36.    EHR technology allows health care providers to record patient information electronically.  It is intended to largely replace paper medical records and to provide functionality that is unavailable with paper records.

37.    Properly functioning EHR technology helps health care providers identify dangerous drug interactions, verify medications and dosages, accurately communicate with pharmacies and other providers, and reduce the need for potentially risky tests and procedures.[7]

38.    In contrast, poorly functioning EHR systems decrease access to appropriate care and increase costs of care.  Poorly functioning EHR systems also pose a threat to public safety, including when they become inoperable, delete data without warning, or do not properly display data.

---

[7] See Health Information Technology Patient Safety Action & Surveillance Plan, available at https://www.healthit.gov/sites/default/files/safety_plan_master.pdf (last visited October 9, 2017).

9

**B.     Federal EHR incentive payment programs incentivize the adoption of certified EHR technology.**

39.     In order to promote the effective and rapid implementation of EHR technology, the United States has made billions of dollars in incentive payments available to health care providers.  The United States has committed up to $27 billion over 10 years to support the adoption and use of EHR technology.

40.     The HITECH Act makes certain physicians and other health care providers eligible for up to $44,000 in incentive payments from Medicare and $63,750 in incentives from Medicaid for demonstrating meaningful use of certified EHR technology.[8] Eligible hospitals and other institutions may also qualify for EHR incentive payments under the HITECH Act, beginning with a $2 million base payment.

41.     To qualify for EHR incentive payments under the HITECH Act, health care providers must (i) possess certified EHR technology, and (ii) demonstrate meaningful use of that certified EHR technology. See 42 U.S.C. § 1395w–4 (as amended by section 4101 of the HITECH Act); 42 U.S.C. § 1395ww (as amended by section 4102 of the HITECH Act); 42 U.S.C. 1396b (as amended by section 4201 of the HITECH Act).[9]

---

[8] See EHR Incentives & Certification, available at https://www.healthit.gov/providers-professionals/ehr-incentive-payment-timeline (last visited October 9, 2017).

[9] See "Early Assessment Finds that CMS Faces Obstacles in Overseeing the Medicare EHR Incentive Program," available at https://oig.hhs.gov/oei/reports/oei-05-11-00250.pdf (last visited October 9, 2017).

42.     The HITECH Act also penalizes providers who fail to show a "meaningful use" of certified EHR technology.  Beginning in 2015, certain Medicare eligible professionals who fail to adopt and successfully demonstrate meaningful use of certified EHR technology incur penalties on their Medicare claims.  The schedule of payments for health care providers who do not demonstrate meaningful use of certified EHR technology is as follows:

    a.     2015—only 99% of Medicare physician fee schedule covered amount

    b.     2016—only 98% of Medicare physician fee schedule covered amount

    c.     2017—only 97% of Medicare physician fee schedule covered amount.[10]

43.     Medicare meaningful use penalties and incentive payment program are being transitioned in 2017 and 2018 pursuant to the Medicare Access and CHIP Reauthorization Act ("MACRA").  As with the HITECH Act, to qualify for EHR incentive payment under MACRA health care providers must use certified EHR technology.[11]  Certification criteria for MACRA-compliant EHR technology were

---

[10] See "Are there penalties for providers who don't switch to electronic health records (EHR)?," available at  https://www.healthit.gov/providers-professionals/faqs/are-there-penalties-providers-who-don%E2%80%99t-switch-electronic-health-record (last visited October 9, 2017).

[11] See EHR Vendor Fact Sheet, available at https://qpp.cms.gov/docs/QPP_EHR_Vendor_Advancing_Care_Information.pdf (last visited October 9, 2017).

published in 2015 and will be mandatory by 2018.[12]  MACRA reporting began in

2017, and the first MACRA incentive payments will be made in January 2019.[13]

      C.     **The EHR certification process.**

    44.     The term "certified EHR technology" as used in the HITECH Act and

MACRA is defined by a series of statutes, regulations, and standards.  See 42

U.S.C. § 300jj(1).

    45.     Pursuant to the HITECH Act, the Office of the National Coordinator

for Health Information Technology ("ONC") has established a certification

program for EHR technology.

    46.     To obtain certification, an EHR vendor must attest to an ONC-

authorized certification body that its technology satisfies the applicable certification

criteria.  An EHR vendor must also submit to certification testing by an accredited

testing laboratory, and pass such testing.

    47.     Certification is a floor and not a ceiling. The certification requirements

set minimum standards that EHR technology must include.  See Health

Information Technology: Standards, Implementation Specifications, and

---

[12] See Fact Sheet: Quality Payment Program and Health Information
Technology, available at https://www.healthit.gov/sites/default/files/
macra_health_it_fact_sheet_final.pdf (last visited October 9, 2017).

[13] See Quality Payment Program, available at https://qpp.cms.gov/ (last
visited October 9, 2017).  Beginning in 2019, health care providers enrolled in
MACRA payment programs may obtain a Medicare payment adjustment increase of
up to 12% and may be assessed a penalty adjustment of up to 4%.  These
adjustments will grow to a maximum 27% payment increase and 9% payment
decrease by 2022.

Certification Criteria for Electronic Health Record Technology, 2014 Edition, 77
Fed. Reg. 54193, 54223.

48.     Certification gives health care providers and patients confidence that
EHR technology can reliably write, store, and display health care data; is secure;
can maintain data confidentially; and can share information with other systems.
Certification additionally provides assurance to consumers that EHR technology
can meet advertised capabilities, and "that those capabilities perform correctly and,
where applicable, that those capabilities properly utilize/support adopted
standards." Id. at 54168.

49.     To become certified, EHR technology must support certain minimum
types of functionality.  For instance, it must reliably and consistently be able to
electronically record, change, and access patient medications, laboratory and
radiology imaging, and automatically indicate a drug-drug or drug-allergy
contraindication.  See 45 C.F.R. § 170.314(a).

50.     Certified EHR systems must also satisfy certain basic standards of
interoperability.  For example, 45 C.F.R. § 170.314 requires that EHR systems
allow health care providers to accurately receive, transmit, and display patient
health and medical data (for instance, known medication allergies) between health
care providers.

51.     Similarly, certified EHR systems must be able to provide patients (and
their authorized representatives) with the ability to view, download, and transmit
health data.  See 45 C.F.R. § 170.314(e).

13

52.     After obtaining certification, an EHR vendor must maintain it by complying with all applicable conditions of the certification program.

53.     An EHR vendor must include on its website and in its marketing materials, communications, and statements related to the certification of its EHR technology a detailed description of "all known material information" concerning (i) additional costs that a user may be required to pay to implement the vendor's EHR technology, and/or (ii) limitations that a user may encounter in implementing the vendor's EHR technology.  See 45 C.F.R. § 170.523(k)(1)(iii).

**D.    The "meaningful use" requirement.**

54.     In addition to being certified, EHR technology must meet "meaningful use" standards in order to qualify health care providers for incentive payments.[14]

55.     Meaningful use standards were designed to be implemented in stages, with each stage more rigorous than the last.

56.     Stage 1 requirements focused on objectives including electronically capturing health information in a coded format, facilitating disease and medication management, and reporting clinical quality measures.[15] Stage 2 requirements expand on the Stage 1 criteria and focused on, among other

---

[14] See An Introduction to the Medicare EHR Incentive Program for Eligible Professionals, available at https://www.cms.gov/Regulations-and-Guidance/Legislation/EHRIncentivePrograms/downloads/Beginners_Guide.pdf (last visited October 9, 2017).

[15] See EHR Incentives & Certification, how to Attain Meaningful Use, available at https://www.healthit.gov/providers-professionals/how-attain-meaningful-use (last visited October 9, 2017).

14

things, the exchange of essential health data among health care providers and patients to improve care coordination.[16] Stage 3 requirements will aim to further improve patient outcomes and will not be implemented until 2018.[17]

## V. REMUNERATION PAID BY ATHENA TO INDUCE SALES OF ITS EHR TECHNOLOGY HAS VIOLATED THE ANTI-KICKBACK STATUTE

57.     In order to promote the sale of Athena's EHR technology, Defendants have violated the AKS by unlawfully offering and paying remuneration to acquire new customers and retain existing customers.

58.     Upon information and belief, this remuneration has consisted of, among other things, direct monetary payments made pursuant to Athena's "client referral incentive program," casino chips, premium sporting tickets, airfare, and luxury hotel accommodations.

### A.     Athena's "client referral incentive program" violates the Anti-Kickback Statute.

59.     Athena has knowingly offered and made payments to participants of its "client referral incentive program" in order to refer health care providers to its EHR services.

60.     Athena's incentive referral program induces existing customers to refer potential new customers to purchase Athena's EHR technology by offering direct cash payments or invoice credits in exchange for referrals.  According to Athena,

---

[16] Id.

[17] Id.; Meaningful Use Stages, available at https://www.athenahealth.com/knowledge-hub/meaningful-use/stages (last visited October 9, 2017).

this program "helps recognize and reward individual practices that recommend a friend or colleague directly to us that turns into a new client for athena."[18]

61.     Under Athena's referral program, if a referral results in an initial demonstration of Athena's EHR technology via telephone call of more than 30 seconds, the referring customer receives $200 or invoice credit of $200.  If a referral results in closed business, Athena's referring customer receives $3,000 per physician in a practice of up to 10 physicians, an additional $1,000 per physician for each physician between 11 and 20 in a practice of up to 20 physicians, and an additional $750 per physician for each physician above 20 in a practice with more than 20 physicians.

62.     For practices without physicians, Athena pays $1,500 for each provider in a practice of up to 10 providers, an additional $500 for each provider between 11 and 20 in a practice of up to 20 providers, and $375 for each provider over 20 in a practice with more than 20 providers.

63.     The EHR services that Athena knowingly markets and sells via its incentive referral program are upon information and belief paid for in part by the United States under federal health care programs.  In this manner, Athena's incentive program violates the AKS.  See 42 U.S.C. § 1320a-7b(b)(2)(A).

64.     By way of example, a Monterey County, California physician was a user of Athena's EHR services who Relator understands chose to continue with

---

[18] See The Advocate, Q2 2015 Edition, available at https://www.athenahealth. com/~/media/athenaweb/files/client/client-advocacy-programs/2015_q2_ newsletter.pdf?la=en (last visited October 9, 2017).

Athena because of its $200 per-call incentive payments and payments of $3,000 per doctor referred. It is Relator's understanding and belief that this physician's practice, along with other practices, have received cash payments and invoice credits from Athena as a result of new client referrals.

65.     It is likewise Relator's understanding and belief that part of the revenue that Athena (which charges users a percentage of their gross billings) has derived from new health care providers through its referral program comes from payments made by the United States through federal health care programs.

66.     Athena's commitment to its incentive program has persisted despite complaints from health care providers and others.

**B.      Gratuities paid by Athena to potential and existing customers violate the Anti-Kickback Statute.**

67.     Upon information and belief, Athena has knowingly used gratuities to generate sales of EHR technology paid for in part by federal health care programs. In this manner, Athena's gratuities violated the AKS. See 42 U.S.C. § 1320a-7b(b)(2)(B).

68.     As an example of an improper gratuity that Relator understands Athena has provided, it is Relator's understanding and belief that the manager of an Essex County, Massachusetts family medical practice chose Athena after being provided in 2014 with gratuities that included a catered steak dinner and Red Sox tickets.

69.     Likewise, on July 10, 2017, Athena employee Kasey Duncan sent an email invitation to a medical clinic on behalf of Athena executive Jeff Hartung. The

17

invitation was for "Athenahealth's Leadership Institute at The Hotel Commonwealth in Boston," and provided that "[y]our flight, meals and hotel will all be covered by Athenahealth." It is Relator's understanding that the purpose of the invitation was to induce the clinic to purchase of Athena's EHR technology.

70.     It is also Relator's understanding that Athena provided airfare, hotel accommodations, meals, and premium sporting tickets during the week of April 10, 2017 to the director of information technology at a health care management and consulting firm in Oklahoma County, Oklahoma. Relator understands and believes that these gratuities were provided in order to induce the purchase of Athena's EHR services.

71.     Relator does not have direct evidence of each gratuity Athena provided to customers and/or potential customers, but understands and believes that Athena's practice of providing gratuities to customers and potential customers was pervasive.

C.      **Athena's violation of the Anti-Kickback Statute caused the United States to incur significant monetary damages.**

72.     Each referral payment or gratuity offered or paid by Athena in order to generate new business paid for in part by the United States through federal health care programs constitutes a distinct violation of the AKS, and Athena's offers and payments constitute improper remuneration under 42 U.S.C. §§ 130a-7b(b)(1)(A)-(B).

18

73.     Upon information and belief, the United States has incurred substantial monetary damages as the result of Athena's improper offers and payments of remuneration in violation of the AKS.

74.     Athena regularly charges its users a percentage of their gross billings in exchange for its EHR services. Relator understands that Athena's charges can range from approximately 4% to approximately 6% of a provider's total billings.

75.     Realtor further understands that providers who have participated in Athena's referral program have collected payment from the United States through federal health care programs.

76.     It is therefore Relator's understanding that a percentage of the payments that the United States has made to providers who have participated in Athena's referral program has gone to Athena for EHR services. These amounts are recoverable as damages.

77.     Based on the foregoing, Relator seeks through this action to recover all available damages, civil penalties, and other relief for the violations alleged herein in every jurisdiction to which Defendants' misconduct has extended.

## VI.   ATHENA'S EHR TECHNOLOGY FAILS TO RELIABLY MEET APPLICABLE CERTIFICATION CRITERIA, CAUSING USERS OF ITS SERVICES TO SUBMIT FALSE CLAIMS TO THE UNITED STATES

78.     Notwithstanding the fact that Defendants have represented that Athena's EHR technology meets the applicable certification standards, and that Athena has knowingly published a series of disclosures wherein it has claimed that its EHR technology is compliant with the applicable certification standards and that users will "will "incur no limitations either to meet meaningful use objectives and

19

measures or to achieve any other use within the scope of the Health IT Module's certification," [19] Athena's EHR technology has upon information and belief failed to meet applicable standards in several respects, which poses risks to patient health and safety.

A.    **Athena's EHR technology fails to reliably meet applicable certification criteria because it generates errors in continuity of care data, resulting in an inability to electronically transfer patient data.**

79.    A complex national health care system requires diverse EHR technologies to cater to a range of health care providers. For diverse EHR technologies to coexist, EHR technology must be able to seamlessly share information. The interoperability of EHR systems is therefore an essential requirement for certification, and is critical to patient health and safety.[20]

80.    EHR interoperability additionally improves workflows, reduces ambiguity, and allows for data transfer among EHR systems designed by different vendors. Ultimately, an interoperable EHR environment improves the delivery of health care services by making the right data available at the right time to the right people.[21]

---

[19] See, e.g., ONC Health IT Transparency Disclosure, available at https://www.athenahealth.com/~/media/athenaweb/files/pdf/athenaclinicals_ambula tory_complete_certification_final.pdf (last visited October 9, 2017).

[20] See "What is EHR Interoperability and why is it important," available at https://www.healthit.gov/providers-professionals/faqs/what-ehr-interoperability- and-why-it-important (last visited October 9, 2017).

[21] Id.

81.    To satisfy interoperability requirements, certified EHR technology must have the ability to generate accurate C-CDA documents, the standard for clinical information exchange.  See 45 C.F.R. §§ 170.314(b)(2),(b)(7),(c)(1).[22]

82.    To demonstrate compliance with this certification criteria, EHR technology must "enable a user to electronically create a set of export summaries for all patients in EHR technology formatted according to the [C-CDA]."  Health Information Technology: Standards, Implementation Specifications, and Certification Criteria for Electronic Health Record Technology, 2014 Edition, 77 Fed. Reg. 54163, 54193.[23]

83.    Upon information and belief, Athena's EHR system has failed to conform to the requirements of 45 C.F.R. § 170.314 and related rules and regulations, as it has been incapable of reliably generating accurate C-CDA data. The practical result of this nonconformance is that Athena's users have been unable to reliably transfer accurate EHR data to patients and other health care providers who use different EHR systems.

84.    By way of example, in September 2017 Relator tested C-CDA data generated by Athena for a patient with an uncomplicated medical history via the C-CDA scorecard – a publicly available testing tool that uses scoring criteria developed through a partnership between ONC and HL7, a nonprofit American

---

[22] See also Leveraging the EHR Certification Program for Clinical Data Extraction" available at https://www.healthit.gov/sites/default/files/ data_extraction_le_final 2016_1_26_01.pdf (last visited October 9, 2017).

[23] See ONC Regulation FAQs, available at https://www.healthit.gov/policy-researchers-implementers/49-question-6-15-049-1 (last visited October 9, 2017).

National Standards Institute-accredited standards developing organization.

Athena's C-CDA data earned a failing grade of 62 out of 100 possible points.[24] The

test noted five C-CDA conformance errors and 23 conformance warnings.

85.     Upon information and belief, Athena C-CDA data for many patients

with more complicated medical histories are likely contain at least as many or more

C-CDA conformance errors,

86.     Athena's resistance to the migration of its clients' data to other EHR

vendors is additional evidence of C-CDA conformance errors.[25]

87.     If an EHR system meets certification standards, migration of data is a

straightforward process.[26]  However, Athena has resisted requests to migrate its

data to other providers.  Upon information and belief, this is at least in part because

---

[24] The scorecard function can be found at https://sitenv.org/scorecard/. The
scorecard assigns a "D" Grade to all data sets that obtain a score below 70. See C-
CDA Scorecard, "How to Interpret the Scorecard Results" available at
https://sitenv.org/scorecard  (last visited October 9, 2017).

[25] Under the Health Insurance Portability and Accountability Act ("HIPAA"),
business associates, including EHR vendors, must return or destroy patient health
information upon termination of an agreement.  See 45 C.F.R. § 164.502(a)(3); 45
C.F.R. § 164.306(a)(1); 45 C.F.R. § 164.304; 45 C.F.R. § 164.524; "May a business
associate of a HIPAA covered entity block or terminate access", available at
https://www.hhs.gov/hipaa/for-professionals/faq/2074/may-a-business-associate-of-a-
hipaa-covered-entity-block-or-terminate-access/index.html (last visited October 9,
2017).

[26] See ONC Regulation FAQs, available at https://www.healthit.gov/policy-
researchers-implementers/49-question-6-15-049-1 (last visited October 9,
2017).Certified EHR systems must enable a user to electronically create a set of
export summaries for all patients in EHR technology formatted according to the C-
CDA standard. See 45 C.F.R. § 170.314(b)(7).

the C-CDA data generated by Athena's EHR system has not been capable of mass data migration without significant oversight.

88.    Instead of migrating data as requested by health care providers, Athena has upon information and belief delayed and improperly demanded termination payments from health care providers who sought to leave with their patients' data.  For instance, a physician in Indian River County, Florida requested to have his data transferred to a new EHR provider after becoming frustrated with Athena's EHR services.  Athena refused to respond to his phone calls.  Ultimately, it took months for the physician to obtain release of his patients' data, and his practice was required by Athena to pay a termination fee to migrate the data to his new EHR provider.[27]

89.    Likewise, a clinic in Maricopa County, Arizona requested to transfer its data to a new EHR provider.  Athena sought to prevent the clinic from migrating by representing that it would refuse to provide meaningful use attestation data if the clinic moved, and further representing that it would not provide patient data after the clinic's move was complete.

---

[27] The physician obtained Medicare incentive compensation payment for the 2012, 2013, and 2015 program years.  See EHR Incentive Programs, Data and Program Reports  available at https://www.cms.gov/Regulations-and-Guidance/Legislation/EHRIncentivePrograms/DataAndReports.html (last visited on October 9, 2017).

**B.     Athena's EHR technology has failed to meet certification
criteria because it has frozen, crashed, or operated so slowly
that it has become effectively inoperable.**

90.     As users of Athena's EHR technology have reported, Athena's EHR
systems have repeatedly suffered from a basic lack of functionality in several key
respects.

91.     When an EHR system crashes, freezes, or operates so slowly that it
becomes inoperable, it ceases to function as a certified EHR system because it
cannot satisfy the applicable certification criteria, including displaying, recording,
and editing health care data. See 45 C.F.R. § 170.314. The failure of EHR
technology to meet these criteria poses risks to patient health and safety.

92.     Athena's EHR technology has upon information and belief frequently
and repeatedly suffered from prolonged periods of inoperability.

93.     For instance, Relator understands that in September 2015 a Pierce
County, Washington physician and Athena user experienced significant periods of
inoperability, and reported that his experience "was simply unfathomable" because,
among other things, "the system kept getting slower, and slower, and slower, by the
last month we were getting dropped off 20-30 times a day and the system was not
responding to us for agonizingly long periods of time." The physician also reported
that Athena's EHR technology "is balky, [and] does not do what they say it will do
or what it actually does, consistently." Relator understands that the physician was
ultimately forced to close his practice.

94.     Likewise, Relator understands that in or around June 2017 a
Montgomery County, Pennsylvania occupational therapist and Athena user

24

experienced the following problems related to the inoperability of Athena's EHR

technology:

> The system is severely lacking and counterintuitive, and if individuals make suggestions for improvement, they are "voted on" for consideration, even if the suggestions are standard in the industry or required by governing bodies. Many requests and improvements are not made. We truly question is [sic] up to date and compliant. . . . AthenaClinicals is just horrible. There is a definite environment within Athena that is brush off, dodge issues, let clients figure it out, and if they leave "oh well." We are disheartened and infuriated at the same time.

The user additionally reported that there are a "[l]ack of quality templates that are

compliant with regulatory agency requirements."

95.     Relator additionally understands that an Anne Arundel County,

Maryland physician and Athena user experienced the following problems associated

with Dr. Athena's EHR technology in or around August 2016:

> There are multiple clinically important flaws within the software. The medication list that the patient sees has no resemblance to the true list that the physician sees. Inaccurate information abounds. The patient sees no instructions on how to take their meds. The completed clinic note is jumbled, with the HPI buried halfway between the Review of Systems and the Family History. It takes 15 clicks of the mouse to refill a prescription. When we send a refill authorization to the pharmacy the patient gets no notification that the work was done. If you order something from Amazon, you get an immediate order confirmation. Not so with Athena. The problem list in the chart is listed in some random illogical order -- so the diagnosis of cerumen impaction can head the list while something important like DM, CHF or COPD might end up at the bottom of the list. The fees that Athena charges are outrageously high. They take a percentage of your collections, so as you'd expect, they work very hard to collect every penny for you. They don't work very hard to improve the part of the EMR that provides excellent patient care. I could go on and on .....but the most discouraging fact is that when the company is alerted

> to software glitches, or issues that could really improve patient care, NOTHING IS DONE. Its not like it takes a few weeks to correct the problems. MONTHS go by and THERE IS NO RESPONSE.....NO CORRECTIVE ACTION.

96.     Relator also understands that in or around 2016, a Franklin County, Ohio physician experienced problems with Athena's EHR technology that were so significant that he believed that they posed a "[r]isk to patients." The physician described Athena's EHR technology as "a mess" and "beyond horrible."

97.     Relator understands and believes that these and other inoperability issues with Athena's EHR technology about which he has knowledge are inconsistent with the standards set forth in 45 C.F.R. § 170.314, and additionally pose a risk to patient health and safety.

### C.     Athena's EHR technology fails to meet certification and criteria because it deletes patient data and incorrectly inputs patient data.

98.     Relator has obtained reports of other significant technological deficiencies with Athena's EHR system, including reports that Athena's system improperly deletes patient data and incorrectly inputs patient data in violation of applicable certification requirements.  See 45 C.F.R. § 170.314(a).  This too poses a risk to patient health and safety.

99.     Because, as noted above, Athena provides near-identical EHR technology to all of its customers, technological deficiencies are uniform across Athena's network.

100.    As one example of the ways in which Athena's EHR technology deletes patient data, Relator understands that in or around November 2015, an Arizona

physician experienced the following problems associated with the failure of Athena's

EHR technology to accurately input patient data:

> [Athena's EHR technology] has many features that increase the chance
> for human error and patient harm, and the company refuses to admit
> or deal with these issues, in fact compounding basic problems in the
> years I have used it. . . .  Medication lists are not presented in a user
> friendly way and don't show the difference between what patient was
> taking before the visit and what has been changed or started/stopped
> in a meaningful way during and after the visit.  This is one of the most
> dangerous aspects of this software, but by no means the only patient
> safety issue.

101.    Relator additionally understands that in or around December 2014,

Athena's EHR technology failed to reliably populate prenatal charts with lab

results, which instead had to be manually entered, in violation of 45 C.F.R. §

170.314(a)(1)(ii).  This information was obtained from staff and physicians of a

medical practice in Riverside County, California.

102.    Relator also understands that a Miami-Dade County, Florida physician

and Athena user has experienced the following problems related to the deletion of

patient data: "It is the worst EMR I have ever had to work with. The dual user issue

is a problem when a doctor and nurse are trying to work together on one patient.

Someone's notes [are] always getting deleted because the other person was in the

chart at the same time! It is also NOT a paperless software. To scan in documents,

we have to print out a cover sheet and a back sheet just to scan a single piece of

paper! Ridiculous!!! Plus plenty more to complain about." Cf. 45 C.F.R. §

170.314(a).

103.   Upon information and belief, these instances, as well as others about which Relator has knowledge in which Athena's EHR system has failed to accurately and reliably record, store, edit, display, and share patient data, violate applicable certification criteria.  See 45 C.F.R. § 170.314.

### D.   The failure of Athena's EHR technology to reliably meet applicable certification requirements has caused the United States to incur substantial monetary damages.

104.   As set forth above, Defendants upon information and belief falsely represented that Athena's EHR technology complied with the requirements for certification and for the payment of incentives under EHR incentive payment programs.

105.   Under the FCA, Athena users' claims for EHR incentive payments constitute false claims caused by Athena. Defendants' false statements about Athena's EHR technology also constitute violations of the FCA and Defendants' use of those statements constitutes the use of a false record or statement material to a false claim under the FCA.

106.   While both the number of false claims that Athena caused to be submitted to the United States and the total amount of those claims is unknown to Relator, each claim that Athena caused its customers to submit for incentive payments violates the FCA.

107.   Athena has represented that since 2011, its customers have received $424,000,000 in incentive payments.[28]

---

[28] See "Full Value Program" available at https://www.athenahealth.com/~/media/b25c1d072cc543faa723ecff3885d119.ashx (last visited October 9, 2017).

108.   Because of the technological failures of Athena's EHR system described above, incentive payments made by the United States to Athena users are damages suffered by the United States.

109.   Additionally, because of the above-referenced technological failures, the United States should have applied penalty modifiers to Athena users that submitted Medicare claims. Such claims should have been reduced by 1% in 2015, 2% in 2016, and 3% in 2017.

110.   Furthermore, each instance in which an Athena customer submitted a claim for (i) EHR incentive payments or (ii) Medicare payments without an appropriate reduction constitutes a distinct false claim that warrants the imposition of penalties of up to $21,916.[29]

111.   Based on the foregoing, Relator seeks through this action to recover all available damages, civil penalties, and other relief for the violations alleged herein in every jurisdiction to which Defendants' misconduct has extended.

## COUNT I
### False Claims Act
### 31 U.S.C. §§ 3729(a)(1)(A)-(B)

112.   Relator incorporates by reference all allegations contained in paragraphs 1 through 111 above as though fully set forth herein.

113.   By virtue of the acts described above, Defendants knowingly caused false claims to be presented to the United States for payment or approval.

---

[29] See 31 U.S.C. § 3729(a)(1)(G).

114.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be used false records or statements material to false or fraudulent claims.

115.   Referral payments and gratuities that Athena paid in connection with its efforts to obtain new customers violated the AKS, and constitute FCA violations.

116.   The United States has made substantial payments, including through Medicare and Medicaid, to health care providers who became Athena customers as the result of referral payments and/or gratuities improperly made and/or offered by Athena in violation of the AKS.  The percentage of those providers' gross billings that were remitted to Athena are recoverable as damages.

117.   Additionally, Athena's deployment of EHR technology that did not meet certification criteria and Defendants' false representations regarding compliance with applicable certification criteria resulted in the United States making the following categories of improper payment:

> a.   Incentive payments for use of EHR technology that should not have been paid; and
>
> b.   Medicare payments that should have been reduced by 1%, 2% and 3% in 2015, 2016, and 2017, respectively.

118.   Every claim for EHR incentive payments submitted to the United States in connection an EHR product that does not meet applicable certification requirements is a distinct false claim in violation of the FCA.

30

119. Defendants knowingly misrepresented to customers in Massachusetts and throughout the nation that Athena's EHR products satisfied certification requirements and were capable of meeting applicable incentive payment requirements. Athena's sales of its EHR products with the flaws described in this Complaint have caused federal compensation to be paid to subsidize Athena's defective EHR systems.

120. Defendants' misrepresentations foreseeably caused customers to purchase Athena's EHR services, foreseeably caused customers to attest to compliance with applicable incentive payment requirements, and foreseeably caused customers to submit claims to the United States for EHR incentive payments to which they were not entitled. In this manner, Defendants knowingly caused false claims to be submitted and paid.

121. Relator understands and believes that thousands of health care providers using Athena's EHR technology have obtained incentive payments and have submitted related attestations to the United States.

122. Relator cannot at this time identify each of the false claims for payment that were caused by Defendants' misconduct.

123. By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

## PRAYER

WHEREFORE, Relator prays for judgment against Defendants as follows:

- That this Court enter judgment against Defendants in an amount equal to three times the amount of the damages described in this pleading;

31

- In addition to the damages described above, that this Court assess a civil penalty of up to $21,916 for each false claim presented to the United States and for each false record or statement Defendants caused to be used in conjunction with a false claim;

- That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

- That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

- That the Court enter such other and further relief as may be appropriate under the circumstances.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

October 27, 2017                    Respectfully submitted,

/s/ Stephen M. Hoeplinger
SCHLICHTER BOGARD & DENTON LLP
Stephen M. Hoeplinger, #676219
Jerome J. Schlichter (*pro hac vice to be filed*)
Andrew D. Schlichter (*pro hac vice to be filed*)
Aaron E. Schwartz (*pro hac vice to be filed*)
100 South Fourth Street, Suite 1200
St. Louis, MO, 63102
(314) 621-6115
(314) 621-5934 (fax)
shoeplinger@uselaws.com
jschlichter@uselaws.com
aschlichter@uselaws.com
aschwartz@uselaws.com