# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* Geordie Sanborn, Cheryl Lovell, and William McKusick, <br><br>            Plaintiffs, <br><br> v. <br><br> ATHENAHEALTH, INC., <br><br>            Defendant. | No. 17-cv-12125-ADB <br> No. 17-cv-12543-ADB <br><br> **JURY TRIAL DEMANDED** |

## UNITED STATES' COMPLAINT IN INTERVENTION

From January 2014 through September 2020, Defendant athenahealth, Inc. ("Athena") – a nationwide provider of Electronic Health Record ("EHR") technology – paid kickbacks to healthcare providers and other EHR vendors to induce them to purchase and recommend its EHR product, athenaClinicals. Athena entertained potential clients with all-expense-paid trips to sporting and recreational events, paid existing clients thousands of dollars for referrals of new healthcare practices, and paid competing vendors that were discontinuing their EHR products to recommend that their clients transition to athenaClinicals. Through these kickback schemes, Athena caused the Medicaid and Medicare programs to pay millions of dollars in false claims for incentive payments.

## NATURE OF THE ACTION

1.      The United States of America ("United States") files this complaint in intervention for the limited purpose of settlement to recover damages arising from false or fraudulent claims that Athena submitted or caused to be submitted to Medicare and Medicaid for

incentive payments paid to healthcare providers for the adoption and use of certified EHR technology.

2. Athena is a Massachusetts-based company that provides cloud-based EHR technology and services to healthcare providers throughout the United States. Athena sells its EHR platform, athenaClinicals, as a standalone service or as part of a suite of EHR, billing, and patient engagement products known as athenaOne.

3. Athena offered and provided illegal remuneration, in cash and in kind, under three programs in order to generate sales of athenaClinicals, either on its own or as part of athenaOne, in violation of the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b). Athena's illegal conduct caused the submission of false claims for payment to federal health care programs in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), and the common law.

4. First, under its "Concierge Event" program, Athena provided existing and potential clients with all-expense-paid trips to sporting, entertainment, and recreational events. These events included, among others, trips to the Masters golf tournament, the Kentucky Derby, NFL, NBA, and MLB games, the NCAA "Final Four," the Indy 500, and New York Fashion Week. Athena provided these gratuities to hundreds of executives, physicians, and other decision makers in order to induce them to purchase athenaOne or athenaClinicals.

5. Second, under its "Client Lead Generation" program, Athena paid its existing clients for referrals of new practices that signed up for athenaOne or athenaClinicals. Athena paid for the referrals based directly on the number of new potential clients referred, up to $3,000 per physician, regardless of how much time (if any) the existing client spent speaking to or meeting with the lead. Under this program, Athena closed business with hundreds of new practices.

6.	Finally, Athena entered into agreements with competing companies that were discontinuing their EHR products to recommend that their clients transition to Athena's EHR platform.  Athena referred to these arrangements as "Conversion Deals."  Under these arrangements, Athena paid the competitor based on the number and value of the clients it successfully converted to athenaOne or athenaClinicals.

7.	By offering and paying this illegal remuneration in cash and in kind, Athena submitted and caused its EHR clients to submit to federal health care programs false or fraudulent claims that resulted from violations of the AKS.

8.	Under the Health Information Technology for Economic and Clinical Health Act ("HITECH Act"), the Department of Health and Human Services ("HHS") established EHR incentive programs under Medicare and Medicaid for healthcare providers (the "EHR Incentive Programs").  With the passage of the Medicare Access and CHIP Reauthorization Act of 2015 ("MACRA"), Congress replaced the Medicare EHR Incentive Program with the Merit-based Incentive Payment System ("MIPS") for certain types of clinicians.

9.	Health care providers who used athenaClinicals and attested to using certified EHR technology to satisfy the requirements of the EHR Incentive Programs and MIPS received incentive payments and/or avoided payment reductions through these programs.  By providing illegal kickbacks to generate sales of its EHR products, Athena submitted and caused its clients to submit false claims in violation of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33.

10.	Unless otherwise specified, the relevant period covered by Athena's payment of unlawful kickbacks as described herein is from January 1, 2014, to September 22, 2020.

## PARTIES

11. The United States, acting through HHS and its component, the Centers for Medicare & Medicaid Services ("CMS"), administers the Medicare program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq*. ("Medicare"), grants to states for Medical Assistance Programs ("Medicaid") pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, *et seq.*, and the EHR Incentive Programs and MIPS Program.

12. Athena is a privately held corporation headquartered in Watertown, Massachusetts. Athena serves more than 160,000 healthcare providers across the United States. Athena was founded in 1997 and was a publicly traded company from September 20, 2007, through February 11, 2019. Since February 2019, Veritas Capital and Evergreen Coast Capital have owned Athena.

13. Relator Geordie Sanborn resides in Massachusetts.

14. Relator Cheryl Lovell resides in Arizona.

15. Relator William McKusick resides in Arizona.

## JURISDICTION AND VENUE

16. This action arises under the FCA, 31 U.S.C. §§ 3729-33, and the common law. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which confers jurisdiction for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. This Court has supplemental jurisdiction over the common law cause of action under 28 U.S.C. § 1367(a).

17. This Court has personal jurisdiction over Athena and venue is appropriate in this District under 31 U.S.C. § 3732(a) because Athena transacts business in this District and caused the submission of false claims from this District.

## STATUTORY AND REGULATORY BACKGROUND

A.     **The False Claims Act**

18.    The FCA imposes civil liability on any person who, *inter alia*: (1) knowingly presents, or causes to be presented, to an officer, employee, or agent of the United States a false or fraudulent claim for payment or approval; or (2) knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim.  31 U.S.C. §§ 3729(a)(1)(A)-(B).

19.    The FCA defines a "claim" to include "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property that—(i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest."  *Id.* § 3729(b)(2).

20.    The FCA defines the terms "knowing" and "knowingly" to mean "that a person, with respect to information—(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information."  *Id.* § 3729(b)(1)(A).  The FCA does not require proof of specific intent to defraud.  *Id.* § 3729(b)(1)(B).

21.    The FCA provides that the term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  *Id.* § 3729(b)(4).

22.    Any person who violates the FCA is liable for a mandatory civil penalty for each such claim, plus three times the damages sustained by the Government.  *Id.* § 3729(a)(1).

B. **The Anti-Kickback Statute**

23. The AKS provides, in pertinent part:

Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

42 U.S.C. § 1320a-7b(b)(2).

24. In 2010, Congress amended the AKS to provide that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for the purposes of [the FCA]." *Id.* § 1320a-7b(g). Congress added this provision to confirm "that all claims resulting from illegal kickbacks are considered false claims for the purposes of civil actions under the [FCA], even when the claims are not submitted directly by the wrongdoers themselves." 155 Cong. Rec. S10854 (Oct. 28, 2009). Congress also clarified the intent requirement for the AKS, and the statute now provides that "a person need not have actual knowledge of this section or specific intent to commit a violation" of the AKS in order to be found guilty of a "willful violation." 42 U.S.C. § 1320a-7b(h).

C. **The Medicare and Medicaid EHR Incentive Programs**

25. Congress enacted the HITECH Act in 2009 to promote the adoption and meaningful use of certified EHR technology.

6

26. Through the Medicare and Medicaid EHR Incentive Programs, CMS and the states make incentive payments to healthcare providers for adopting and demonstrating meaningful use of certified EHR technology. *See* 75 Fed. Reg. at 44,314 (noting that the EHR Incentive Programs "provide incentive payments to eligible professionals (EPs), eligible hospitals and critical access hospitals (CAHs) participating in Medicare and Medicaid programs that adopt and successfully demonstrate meaningful use of certified electronic health record (EHR) technology").

27. Under the EHR Incentive Programs, "eligible professionals" (including physicians and certain other types of clinicians) could qualify either for up to a total of $44,000 over five years from Medicare (subject to sequestration for certain program years and ending after 2016) or up to a total of $63,750 over six years from Medicaid (ending after 2021). Eligible hospitals and critical access hospitals could also qualify under Medicare or Medicaid for incentive payments. Eligible hospital incentive payments started with a $2 million base amount that was adjusted based on the number of hospital discharges and a "transition factor."

28. Starting in 2015, eligible healthcare providers that did not demonstrate that they were meaningful users of certified EHR technology could receive downward payment adjustments under Medicare. 42 U.S.C. §§ 1395w-4(a)(7)(A), 1395ww(b)(3)(B)(ix)(I).

29. Healthcare providers could qualify for incentive payments and/or avoid downward payment adjustments under the Medicare EHR Incentive Program by attesting each year that they used certified EHR technology and satisfied other program requirements.

30. Healthcare providers also attested that, "by filing this attestation [they were] submitting a claim for Federal funds, and that the use of any false claims, statements, or documents, or the concealment of a material fact used to obtain a Medicare EHR Incentive

Program payment, may be prosecuted under applicable Federal or State criminal laws and may also be subject to civil penalties."

31.   States imposed substantially similar attestation requirements under the Medicaid EHR Incentive Program.

      **D.**      **The Merit-based Incentive Payment System**

32.   In 2015, Congress enacted MACRA, which replaced the Medicare EHR Incentive Program with MIPS for physicians and certain other types of clinicians.  *See* 42 U.S.C. § 1395w-4(q).  MIPS consolidated several pre-existing Medicare incentive programs for clinicians—including the Medicare EHR Incentive Program—into a single program.

33.   Under MIPS, CMS assesses "MIPS eligible clinicians" in four performance categories: quality, resource use, clinical practice improvement activities, and meaningful use of certified EHR technology.  *Id.* § 1395w-4(q)(2)(A).  Based on these four performance categories, CMS gives the MIPS-eligible clinician a "composite performance score" that it used to calculate a positive, neutral, or negative payment adjustment factor that is applied to the eligible clinician's payments on claims for covered professional services under Medicare Part B in a subsequent year.  *Id.* § 1395w-4(q)(1)(A)(iii) & (q)(6).

34.   Under MIPS, CMS assesses meaningful use of certified EHR technology using criteria similar to those under the Medicare EHR Incentive Program.  *Id.* § 1395w-4(q)(2)(B)(iv).  In each payment year, in general, 25 percent of the composite performance score may be derived from the meaningful use of certified EHR category.  *Id.* § 1395w-4(q)(5)(E)(i)(IV) & (E)(ii).

35.   In 2019, the first year of payment adjustments under MIPS, MIPS-eligible clinicians could receive a positive or negative payment adjustment of up to four percent.  *Id.* § 1395w-4(q)(6)(A)(iii)-(iv) & (q)(6)(B).  In 2020, MIPS-eligible clinicians could receive a

positive or negative payment adjustment of up to five percent.  *Id.*  In addition, MIPS-eligible clinicians with "exceptional" composite performance scores were eligible for an additional payment adjustment factor that results in further positive adjustment to payments beyond the MIPS adjustment factor.  *Id.* § 1395w-4(q)(6)(C).

### ATHENA'S MARKETING PROGRAMS THAT VIOLATED THE ANTI-KICKBACK STATUTE

36. Between January 1, 2014, and September 22, 2020, Athena provided unlawful remuneration to prospective clients, existing clients, and competitor EHR vendors in the form of Concierge Events, Client Lead Generation payments, and Conversion Deals.  Athena made these payments to induce sales of Athena's EHR platform, athenaClinicals, either as a stand-alone product or as part of the athenaOne bundle.

**A.    The Concierge Events Program**

37. From June 2014 to April 2018, Athena invited prospective clients and existing clients to sports, entertainment, or recreational events—which it referred to as "Concierge Events"—in order to induce the sale of new EHR business or retain existing EHR business.  Athena targeted individuals who were in a position to influence or make decisions concerning their practices' selection or retention of an EHR vendor.

38. The Concierge Events had different tiers of cost and luxury depending on the value of the prospect or client.  For example, as Athena's senior managers of event marketing described in a July 2015 internal PowerPoint presentation, the Concierge Events ranged from "high profile, bucket list experiences executed on a five star level to regional arts and entertainment programming."  Athena's marketing team referred internally to its highest tier events as "Marquee" Concierge Events, which were reserved for high-value deals.  "Marquee" events often took place over multiple days, and Athena provided complimentary travel,

accommodations, and other gratuities to the attendees. Lower-tier events were single day events where Athena provided either private suites or premium tickets to lower-value prospects and clients.

39. For example, Athena hosted Concierge Events at the U.S. Open Golf Championship, the World Series, the Indy 500, and New York Fashion Week, in addition to numerous NBA, NFL, and NHL games and college sports events.

40. One of Athena's premiere annual events was the Masters Golf Tournament in Augusta, Georgia. Between 2015 to 2018, Athena invited hundreds of executives and physicians to attend the Masters at Athena's expense. Athena's guests received free badges to attend one day of the tournament, free airfare and private car service, and lodging in luxury homes where, as Athena's director of event marketing noted in a 2017 recap of the event, "the overall atmosphere highlights athena's culture and hospitality." There, Athena's guests received food and beverages (including high-end alcohol), cigars, recreational golf, and Masters branded gifts. Athena's guests also had access to the Club Magnolia Hospitality Resort and its amenities at the site of the tournament golf course. Prior to 2018, the Masters events had no structured educational component, and Athena permitted invitees to bring guests or spouses.

41. Athena emphasized in invitations to clients that the Masters was a "bucket list" item, and internal Athena documents reflect that it "heard from countless guests that this was a once in a lifetime opportunity, and that they were extremely appreciative of athena's generosity."

42. Another "marquee" event was the Kentucky Derby. As with the Masters, Athena provided Kentucky Derby attendees with door-to-door service for the duration of the trip, which lasted from Thursday to Sunday. Athena provided roundtrip airfare, "[a]ccommodations in a fully appointed private residence located near the track," and multiple receptions and meals to

the guests. At the Derby itself, guests viewed the race from the "private 'Turf Suite' located at the Starting Gate at historic Churchill Downs"—a luxury suite located in a premier location on the racetrack grounds. The suite provided guests with "an unforgettable experience and some of the finest amenities in professional sports." The Kentucky Derby events had no structured educational component, and Athena permitted invitees to bring guests or spouses.

43. Athena noted in an internal document entitled "Events ROI and Framework" that its purpose in hosting Concierge Events was "[t]o help nurture and close strategic accounts."

44. In furtherance of this objective, Athena invited only guests who were capable of influencing their company's decision to purchase or retain Athena's EHR, with more restrictions for more exclusive and costly events. For the Masters, only C-suite level executives or decision makers from larger deals were eligible to attend.

45. As an Athena Senior Vice President explained in an April 2017 internal email, "[W]e invite execs from some of our larger deals (the only way you can really justify the spend) to enjoy a day at The Masters and knock something of [sic] their bucket list."

46. Internal tracking documents and communications indicate that the Concierge Event program induced attendees to recommend and purchase Athena's EHR platform. Athena tracked wins and losses of practices that attended the Masters and attributed sales to various other events. In internal documents and communications, Athena touted the usefulness of the Masters and other concierge events in its efforts to generate EHR business.

47. Athena ignored a number of red flags with respect to the Concierge Events.

48. Athena's own policies prohibited the payment of kickbacks and improper business payments or gifts, including a prohibition on gifts that were lavish, inappropriate, or suspicious, or gifts that were "likely or intended to influence a specific decision or deal."

11

49.     In addition, some of those Athena invited to the Masters and the Kentucky Derby reported to the company that they could not attend because the events did not have a legitimate educational or business purpose.  In internal documents, Athena explained that some "[g]uests don't want to/can't accept because there is no business justification," that prospects could not accept "non-educational type trips, i.e., they could not go to Masters nor Kentucky Derby," and that "[r]ecruitment was a challenge for the Masters," because "[m]any of [the] invitees had compliance issues that prevented them from accepting [an] invitation."

50.     Athena ended the Concierge Events program in April 2018.

**B.     The Client Lead Generation Program**

51.     From approximately January 2014 to September 2020, Athena operated a "Client Lead Generation" program, under which Athena offered and made payments to its existing clients for referrals of new athenaOne or athenaClinicals clients.  Under this program, Athena entered into agreements with current Athena clients to serve as "Lead Identifiers" on behalf of Athena.

52.     Athena paid Lead Identifiers based on the volume and value of businesses they referred to Athena, as follows:

53.     Athena paid $200 for each meeting it held with a prospective client that was referred by a Lead Identifier.

54.     If the prospective client signed up for athenaOne or athenaClinicals, Athena made additional payments to the Lead Identifier who referred the new practice.

55.     For successful referrals of an ambulatory practice, Athena paid $3,000 per doctor for the first ten physicians in the practice, $1,000 per doctor for the next ten physicians, and $750 per doctor for physicians beyond the first twenty.

56. For successful referrals of ambulatory practices without physicians, such as physical therapists, Athena paid $1,500 per provider for the first 10 providers, $500 per provider for the next ten providers, and $375 per provider beyond the first twenty.

57. For successful referrals of inpatient hospital programs, Athena paid $10,000 for each inpatient hospital program that entered into a services agreement with Athena.

58. On May 31, 2017, the United States Department of Justice announced a settlement with eClinicalWorks ("ECW"), an EHR vendor. In a complaint in intervention filed for purposes of settlement, the United States alleged, among other things, that ECW had violated the FCA and the AKS through a "referral program" where ECW "paid current users as much as $500 dollars for each provider they referred who executed a contract with ECW." *See* Compl. ¶ 80, *United States ex rel. Delaney v. eClinicalWorks*, No. 2:15-cv-00095 (D. Vt. May 12, 2017).

59. Athena had actual knowledge of the ECW settlement and complaint in intervention and knew that its Client Lead Generation program was substantially similar to the allegations concerning ECW's referral program.

60. In 2018, rather than discontinuing the Client Lead Generation program, Athena changed its name to the "Introductions" program. Yet Athena's Client Lead Generation program did not change in substance, and Athena continued to pay existing clients for the value and volume of referrals as it had done before it changed the name of the program.

61. The Client Lead Generation program generated over 2,000 leads, and Athena closed business with at least 750 new practices from those leads.

C. **Conversion Deals**

62. Finally, Athena paid money to competitors that were terminating their EHR offerings to recommend that their users convert to Athena's products. Athena referred to these

13

relationships as "Conversion Deals." Athena entered into Conversion Deals and made payments for referrals of new clients with at least ten different companies.

63. The largest Conversion Deal involved SOAPware, an EHR vendor that developed an inexpensive EHR platform for the outpatient setting.

64. Athena entered into a contract with SOAPware in October 2017 for SOAPware to act as a "sales and marketing agent" for Athena services. Under the terms of the deal, Athena paid SOAPware based on the value and volume of the SOAPware EHR client base that the company successfully converted to Athena's products.

65. SOAPware concurrently entered into a confidentiality agreement with Athena, and neither party generally disclosed that SOAPware had a financial incentive to convert its clients to Athena's EHR products.

66. SOAPware's dual role as EHR provider and undisclosed marketer on behalf of Athena led to confusion among SOAPware's clients as to the nature of its relationship with Athena and its motivations for recommending Athena's products.

67. SOAPware's dual role also provided Athena with a strategic advantage over competitor EHR companies attempting to win business with SOAPware's clients. Under the deal, Athena obtained client lists and was able to contact SOAPware's clients before other EHR vendors were aware that SOAPware intended to discontinue its offering. Athena also worked with SOAPware to create a solution to migrate client data to athenaClinicals before SOAPware announced that it was terminating its service. SOAPware clients who selected EHR platforms other than athenaClinicals reported significant difficulty in migrating their data to those platforms.

68. Ultimately, over 100 of the clients that SOAPware referred to Athena under the

deal converted to Athena's offerings.

69.     Athena ended the Conversion Deals program following the SOAPware conversion deal.

**ATHENA SUBMITTED AND CAUSED THE SUBMISSION OF FALSE CLAIMS**

70.     Athena knowingly submitted and caused its clients to submit false claims for EHR Incentive Program Payments resulting from Athena's payment of illegal remuneration to hundreds of clients and several EHR vendors throughout the United States, causing Medicare and Medicaid to pay millions of dollars in incentive payments that were not payable.

### COUNT I
### False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

71.     The United States incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

72.     Through the conduct alleged above, Athena knowingly and willfully offered and paid remuneration in violation of the AKS, 42 U.S.C. § 1320a-7b(b)(2), to induce the recipients to refer persons for the furnishing or arranging for the furnishing of Athena's EHR products or to induce the recipients to purchase, lease, order, or arrange for or recommend the purchasing, leasing, or ordering of Athena's EHR products, for which payment was made in whole or in part under Medicare and Medicaid, each a federal health care program.

73.     As a result of the kickbacks, Athena knowingly submitted and caused healthcare providers to submit claims for federal incentive payments that were false or fraudulent, and not payable, in violation of the FCA, 31 U.S.C. § 3729(a)(1)(A).

74.     By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

## COUNT II
## Unjust Enrichment

75.     The United States incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

76.     The United States claims the recovery of all monies by which Athena has been unjustly enriched, including profits earned by Athena because of the unlawful conduct alleged above.

77.     Athena was unjustly enriched, and is liable to account for and pay such amounts, which are to be determined at trial, to the United States.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff the United States of America prays for judgment against the Defendant as follows:

78.     On Count I under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with such further relief as may be just and proper.

79.     On Count II for unjust enrichment, for the damages sustained and/or amounts by which Athena retained illegally obtained monies, plus interest, costs, and expenses, and such further relief as may be just and proper.

| | |
|---|---|
| Dated:  January 22, 2021 | Respectfully submitted, |
| | UNITED STATES OF AMERICA |
| BRIAN M. BOYNTON<br>Acting Assistant Attorney General | ANDREW E. LELLING<br>United States Attorney |
| | By: */s/ Jessica J. Weber* |
| JAMIE ANN YAVELBERG<br>EDWARD C. CROOKE<br>J. ANDREW JACO<br>NICHOLAS C. PERROS<br>Attorneys, Civil Division<br>United States Department of Justice<br>Post Office Box 261, Ben Franklin Station<br>Washington, D.C. 20044<br>202-616-2629<br>nicholas.c.perros@usdoj.gov | DAVID J. DERUSHA<br>JESSICA J. WEBER<br>Assistant United States Attorneys<br>1 Courthouse Way, Suite 9200<br>Boston, MA 02210<br>(617) 748-3100<br>david.derusha@usdoj.gov<br>jessica.j.weber@usdoj.gov |