**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* Geordie Sanborn, Cheryl Lovell, and William McKusick, | |
| *Plaintiffs*, | No. 17-cv-12125-NMG |
| v. | No. 17-cv-12543-NMG |
| ATHENAHEALTH, INC., | |
| *Defendant*. | |

**MEMORANDUM IN SUPPORT OF RELATOR SANBORN'S MOTION**
**FOR REASONABLE EXPENSES, ATTORNEYS' FEES,**
**AND COSTS PURSUANT TO 31 U.S.C. § 3730(d)(1)**

Relator Geordie Sanborn brings this motion to obtain the reasonable attorneys' fees,

expenses, and costs to which he is indisputably entitled under 31 U.S.C. § 3730(d)(1), but which

Defendant Athenahealth Inc. has not agreed to pay.

Relator Sanborn originally brought this *qui tam* action on behalf of the United States on

October 30, 2017.  In his complaint, Relator Sanborn sought to recover damages and civil

penalties arising from allegedly false records, statements, and claims made and caused to be

made by Defendant and its agents related to the sale, marketing, and implementation of its

electronic health record ("EHR") technology.

After identifying, developing, and alleging the claims set forth in Relator Sanborn's

complaint, over the past 3.5 years Relator Sanborn's attorneys have worked diligently on a

contingent basis, without any guarantee of payment or reimbursement of expenses, to advance

his claims on behalf of the United States.  This work culminated on January 27, 2021 in a

settlement agreement between the United States, Relator Sanborn, two other relators, and

Defendant, in which all of Relator Sanborn's claims were required to be, and were, fully released

1

in exchange for Defendant's payment of $18.25 million, plus interest, to the government.

Relator Sanborn now seeks the reasonable attorneys' fees that 31 U.S.C. § 3730(d)(1) requires Defendant to pay in the amount of $761,828.50, as well as reimbursement of $15,125.33 in expenses.  Documents providing detailed support for these fees and expenses, including detailed time and expense entries and descriptions of the work performed by Relator Sanborn's attorneys, as well as declarations from leading False Claims Act and other practitioners regarding the reasonableness of Relator Sanborn's fees, costs, and expenses and his attorneys' hourly rates, are attached hereto.

## **BACKGROUND**

### A.    **The Background and Experience of Relator Sanborn's Attorneys**

Relator Sanborn's lead attorney in this matter is the undersigned Andrew D. Schlichter. He has extensive experience in high-stakes, complex litigation, and leads Schlichter Bogard & Denton's whistleblower practice.  Schlichter Decl. ¶4.  He currently serves as lead counsel in numerous complex cases throughout the country, including multiple nationwide class actions pending in federal courts, as well as other large complex matters pending throughout the country. *Id*.  He has for years represented clients in matters arising under the False Claims Act, currently as counsel to relators in *qui tam* matters and previously on the defense side.  *Id*.  He supervised the work of Schlichter Bogard & Denton attorneys and staff in this matter.  *Id*. ¶56.

The other Schlichter Bogard & Denton attorneys who worked on this matter on behalf of Relator Sanborn include Jerome J. Schlichter (founding and managing partner), Joel Rohlf (counsel), Alexander L. Braitberg (associate), Nathan Emmons (associate), and Aaron Schwartz and Brian Bush (former attorneys).  Additional work was performed by more than a dozen other attorneys, but, as set forth in herein and the accompanying declaration of Andrew Schlichter, Relator Sanborn does not seek compensation for this work, which has been removed in an

exercise of billing discretion.

Jerome J. Schlichter has in nearly 50 years of practice handled substantial personal injury cases, civil rights and financial class actions, mass torts, and whistleblower matters. *Id*. ¶11. He has been featured in numerous national publications, including *The New York Times*, *Reuters*, *Bloomberg*, *USA Today*, and the *Wall Street Journal*, for his and the firm's success in pioneering claims on behalf of plaintiffs. *Id*. He has been called "The Lone Ranger of the 401(k)" by *The New York Times* and "the industry's most feared attorney" by *Chief Investment Officer*. *Id*.

Joel D. Rohlf is counsel at Schlichter Bogard & Denton. *Id*. ¶12. He has represented both relators and defendants in False Claims Act cases and claims brought under analogous state false claims act provisions throughout the country. *Id*. This includes representing pharmaceutical companies in multiple False Claims Act cases and analogous actions brought by attorneys general for several states. *Id*. Rohlf has written articles on state false claims act provisions and their application to health care fraud cases. *Id*. Schwartz, who is now counsel at Capes, Sokol, Goodman & Sarachan, P.C., has significant False Claims Act experience, including by having served as the lead lawyer in obtaining a significant settlement against a for-profit college. *Id*. ¶13. Alexander L. Braitberg is an associate at Schlichter Bogard & Denton who has devoted his career to complex litigation, and has been significantly involved in a broad range of nationwide litigation matters concerning complex statutory and administrative regimes, including the False Claims Act. *Id*. ¶14. Nathan Emmons, also a Schlichter Bogard & Denton associate, has experience in a diverse range of subject matters, including the False Claims Act. *Id*. ¶15. Bush is a former attorney at Schlichter Bogard & Denton with approximately 16 years of legal experience. *Id*. ¶16.

**B.**    **Schlichter Bogard & Denton's Work on Behalf of Relator Sanborn**

After being retained by Relator Sanborn to pursue a potential *qui tam* action under the False Claims Act against Defendant, Schlichter Bogard & Denton attorneys carefully and diligently investigated Relator Sanborn's claims.  Thereafter, Schlichter Bogard & Denton attorneys prepared both his complaint and the extensive mandatory disclosures required under the False Claims Act, and worked closely with the U.S. Attorney's Office for the District of Massachusetts and the Department of Justice to further investigate Defendant's conduct.  More than three years after Relator Sanborn filed his complaint, this work resulted in a landmark settlement on behalf of the United States based on claims identified, developed, and brought to the government by Relator Sanborn.

To achieve this result, Schlichter Bogard & Denton performed the following necessary and reasonable litigation tasks, as documented in greater detail in the Declaration of Andrew D. Schlichter ("Schlichter Decl.") filed herewith:

- Thorough investigation of the underlying claims and related legal issues;

- Preparation of the complaint, which included both kickback claims and claims related to allegedly improper "meaningful use" incentive payments from the government;

- Preparation of the mandatory disclosures required under the False Claims Act, including a detailed, lengthy disclosure statement and accompanying materials designed to aid the government's investigation;

- Preparation for and attendance at interviews with the government, and communications with the government on an ongoing basis about case developments and additional requested information;

- Preparation of follow-up, supplemental disclosures as requested by the United States;

- Consultation with experts in the electronic health records field;

- Conferences with co-counsel and Boston counsel regarding strategic case-related matters and developments;

- Legal and factual research and continued post-complaint factual investigation;

- Negotiations with the United States, Defendant, and the other Relators; and

- Drafting, reviewing, and editing settlement documents.

Schlichter Decl. ¶17.

**C.    The United States' Intervention and the Release of All of Relator Sanborn's Claims**

On January 21, 2021, the United States filed a complaint in intervention that incorporated and directly relied upon claims identified, developed, alleged, and brought to the government by Relator Sanborn in his complaint, disclosure statement, and supplemental disclosures to the United States.  Shortly thereafter, on January 27, 2021, the United States, Relators, and Defendant executed a settlement agreement.  Schlichter Decl. ¶28, Exhibit 1 (Settlement Agreement).  On February 4, 2021, the United States and Relators filed a notice of voluntary dismissal.  ECF No. 63.  On February 5, 2021, the Court dismissed in part Relators' claims.  ECF No. 64.  However, the Court "d[id]not dismiss Relators' claims for attorneys' fees, expenses, and/or costs pursuant to 31 U.S.C. § 3730(d)(1) and its state analogs[.]"  *Id.*

The settlement provides substantial relief to the United States.  Defendant has agreed to discontinue the challenged conduct and pay $18,250,000, plus interest, to the United States.  In exchange for this payment, Defendant obtained a release from Relators of <u>all</u> of Relators' claims, including Relator Sanborn's claims related to kickbacks and his claims related to allegedly improper "meaningful use" incentive payments from the government.  *See* Schlichter Decl. ¶28, Ex. 1 at 4.  Relators' claims for reasonable attorneys' fees, expenses, and costs under 31 U.S.C. § 3730(d)(1) were preserved by the settlement agreement.  *Id.*

**D.    Relator Sanborn's Efforts to Resolve This Fee Dispute**

Between November 2020 and the present, Relator Sanborn has worked diligently and in good faith to attempt to resolve this fee dispute with Defendant, including by taking part in many teleconferences and exchanges of correspondence and information.  Schlichter Decl. ¶57.

5

Notwithstanding these efforts over several months, the parties have been unable to reach agreement regarding the payment of reasonable fees and expenses to Relator Sanborn.  *Id.*

## ARGUMENT

Relator Sanborn is indisputably entitled to attorneys' fees and costs under the plain language of the False Claims Act.  31 U.S.C. § 3730(d)(1).  Because the time his attorneys have dedicated to this case – which has already been reduced by approximately 15% – was necessary and integral to the prosecution of Relator Sanborn's claims, and because the hourly rates for Relator Sanborn's attorneys have been repeatedly approved by federal courts and are well within (if not materially lower than) the range of reasonable hourly rates charged by firms that handle complex False Claims Act litigation, Relator Sanborn is entitled to the $761,828.50 amount of his fees and $15,125.33 amount of his expenses requested herein.

Moreover, there can be no serious dispute that Relator Sanborn is entitled under 31 U.S.C. § 3730(d)(1) to fees for his attorneys' work on all of his claims that were released in the settlement agreement, including work related to his kickback claims and his claims concerning "meaningful use" incentive payments.  Any argument that Relator Sanborn is not entitled to fees on claims that were required to be (and were) released in the settlement agreement, but on which the government did not specifically intervene, is entirely unsupported, incorrect as a matter of law, and contrary to the False Claims Act's plain language.

**I.** **The False Claims Act Requires Payment of Reasonable Attorneys' Fees, Expenses, and Costs**

Under 31 U.S.C. § 3730(d)(1), Relator Sanborn is unquestionably entitled to reasonable attorneys' fees, expenses, and costs.  To be clear:  the False Claims Act requires "that if the Government proceeds with an action brought by a person under § 3730(b) that relator is entitled to a percentage of the proceeds of the action or settlement of the claim as well as reasonable

expenses, attorneys' fees and costs." *United States ex rel. Allstate Ins. Co. v. Millennium Labs., Inc.*, 464 F. Supp. 3d 449, 452 (D. Mass. 2020) (citing 31 U.S.C § 3730(d)(1), internal punctuation omitted).  The government proceeded with claims brought by Relator Sanborn here. Therefore, he is entitled to his fees and costs.

By way of background, "[t]he False Claims Act is the primary law on which the federal government relies to recover losses caused by fraud." *McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005).  In 1986, Congress queried "why fraud in Government programs is so pervasive yet seldom detected and rarely prosecuted."  S. Rep. No. 99-345 at 4, 1986 U.S.C.C.A.N. 5266.  It found "serious roadblocks to obtaining information as well as weaknesses in both investigative and litigative tools."  *Id*.  In Congress's view, "the most serious problem plaguing effective enforcement is a lack of resources on the part of Federal enforcement agencies."  *Id*. at 7.  "Allegations that perhaps could develop into very significant cases are often left unaddressed at the outset due to a judgment that devoting scarce resources to a questionable case may not be efficient."  *Id*.  Then, "large, profitable corporations" became "the subject of a fraud investigation," and were able "to devote many times the manpower and resources available to the Government," resulting in a "resource mismatch."  *Id*. at 8.

As a result, Congress amended the Act to make it "the Government's primary litigative tool for combating fraud" "in modern times." S. Rep. No. 99-345 at 2; *see also* H. Rep. No. 99-660 at 18 (1986) (False Claims Act "used as the primary vehicle by the Government for recouping losses suffered through fraud"); S. Rep. No. 111-10 at 10, 2009 U.S.C.C.A.N. 430, 437 (reinvigorated False Claims Act declared "[o]ne of the most successful tools for combating waste and abuse in Government spending").  Primary among the amendments were

reinforcements of the *qui tam* provisions.  "[O]nly a coordinated effort of both the Government and the citizenry will decrease this wave of defrauding public funds."  S. Rep. No. 99-345 at 2.

For the Act to function as intended, however, relators must secure competent, experienced representation.  Congress knew this when it amended the Act in 1986, concluding that the "unavailability of attorneys' fees" in the prior versions of the law "inhibits and precludes many private individuals, as well as their attorneys, from bringing fraud suits."  *Id*. at 29.  The fee provision in section 31 U.S.C. § 3730(d) effectuates the Act's purposes by attracting attorneys capable of prosecuting these claims.  As a result, the 1986 amendments have been a success:  "[w]ithout a doubt, relators and their attorneys play a vital role in rooting out health care fraud and obtaining recovery of the public monies that were intended to be spent for providing health care to veterans and poor, elderly, and disabled citizens."  *United States ex rel. Doghramji v. Cmty. Health Sys.,* 666 Fed. Appx. 410, 419–20 (6th Cir. 2016) (concurring op.).

Successfully litigating a False Claims Act case on behalf of a relator requires significant specialized skill and diligent attention; indeed, evidence of wrongdoing provided by relators "is just the beginning."  *Id*.  "Attorneys then must undertake the substantial investigative work and expense of putting together a case for their relators then present it to government officials to determine if the government is willing to proceed with the litigation."  *Id*.  After the intervention, however, "the government's bargain sets the basic terms of the settlement agreement, the timetable, and resolves payment to the relators." *Id*.  "[C]ounsel are often left to negotiate the terms governing payment of attorney fees – even for the considerable work accomplished by counsel at the government's behest.  Much is at stake because these negotiations may determine whether a defendant – which took public money through health care fraud – must pay a relator's counsel for their work in forcing the return of that money."  *Id*.

Here, as the result of Relator Sanborn's efforts in investigating, developing, and prosecuting the underlying claims against Defendant over an approximately 3.5-year period, the government intervened in this case in January 2021.  The investigation and prosecution of this claim by Relator Sanborn and his attorneys directly led to and culminated in a landmark $18.25 million settlement for the United States.  Accordingly, there can be no dispute that Relator Sanborn is entitled to reasonable fees, expenses, and costs under 31 U.S.C. § 3730(d)(1).

## II.     Relator Sanborn Is Entitled to Fees, Expenses, and Costs on <u>All</u> Released Claims

As a condition of settlement, Relator Sanborn was required to release both his kickback claims and his "meaningful use" incentive payment claims – and the settlement agreement releases both claims.  Consequently, Relator Sanborn is entitled to recover reasonable fees, expenses, and costs on <u>all</u> released claims – not only claims on which the government specifically intervened.

Defendant may contend, incorrectly, that Relator Sanborn is not entitled to reasonable fees, expenses, and costs for claims that were released, but on which the government did not intervene.  But any such argument is contrary to law.  The False Claims Act unequivocally provides that a relator in an "action" where the government intervenes and settles "shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs.  All such expenses, fees, and costs shall be awarded against the defendant."  31 U.S.C. § 3730(d)(1).

Moreover, there is no language in the False Claims Act that even remotely suggests that a relator is limited to fees related to claims on which the government intervened or on which the relator prevailed.  *Id.*  Indeed, as the U.S. Supreme Court has held, a statute is construed to include a prevailing party or prevailing claim requirement only where the statute expressly limits the fee award to a prevailing party or claims upon which a party prevailed.  *Hardt v. Reliance*

9

*Standard Life Ins. Co.*, 560 U.S. 242, 252 (2010) ("The words 'prevailing party' do not appear in this provision. Nor does anything else in § 1132(g)(1)'s text purport to limit the availability of attorney's fees to a 'prevailing party.' Instead, § 1132(g)(1) expressly grants district courts 'discretion' to award attorney's fees 'to either party.'").   The express language of the False Claims Act, in contrast, entitles a relator to a fee award in any "action" in which the government intervenes and settles and does not limit that award to certain claims within that action.   31. U.S.C. § 3730(d)(1); *United States ex rel McNeil v. Jolly*, 451 F. Supp. 3d 657, 686 n.119 (E.D. La. 2020) ("However, § 3730(d)(1), which governs awards to qui tam plaintiffs, does not restrict attorneys' fees, costs, and expenses to a 'prevailing party,' as explained previously. Section 3730(g) allows a 'prevailing defendant' to recover fees and costs, but that provision is inapplicable here. Thus, the 'prevailing party' determination is inapposite in this case.").

Consistent with this controlling precedent and the plain language of the False Claims Act, former Chief Judge Young of this District determined that the False Claims Act mandates a fee award to relators' counsel for <u>all</u> released claims – even those on which the government does not intervene.  *U.S. ex rel. Averback v. Pastor Med. Assoc. P.C.*, 224 F. Supp. 2d 342 (D. Mass. 2002).  In that case, the court rejected a defendant's argument that 31 U.S.C. § 3730(d)(1) fees, costs, and expenses were unavailable for work performed by relator's counsel on claims that were released, but on which the government did not intervene.  As the court found, instead, the defendant's position that fees, expenses, and costs should be available only for released claims would unfairly penalize a relator for bringing a complaint that contained claims that the government opted not to specifically pursue – a decision that the court found "is not equivalent to a jury's (or court's) decision that a claim is without merit."  *Id*. at 350 n.7.  As the court continued:

It would fly in the face of the 'private attorney general' motivation behind the False Claims Act to parse out complaints and attorney billing records to such a point where any hours researching claims found somehow 'unsuccessful' or 'unrelated' to the final settlement in a case that was never litigated in open court would be deducted from the total hours claimed in a fee application under section 3730(d)(1). Such a rule would provide a disincentive to an attorney to bring any borderline claims at all, for fear that their work would not be reimbursed, and would greatly impact the scope and efficacy of complaints brought under the False Claims Act.

*Id*.

Courts across the country have reached the same conclusion when confronted with analogous circumstances.  The Seventh Circuit characterized as "extraordinary" and "outrageous" a False Claims Act defendant's argument that 31 U.S.C. § 3730(d)(1) fees, costs, and expenses are unavailable for work related to released claims.  *U.S. ex rel. Fallon v. Accudyne Corp.*, 97 F.3d 937, 939 (7th Cir. 1996).  There, as here, the defendant received a release of multiple claims from relators, while the government intervened on only one claim.  The court rejected the defendant's position that fees, expenses, and costs are unavailable on released claims.  As the court explained:

[Defendant] could have bargained for a settlement limited to Count I . . . . If so, [defendant] could have paid $12 million to settle Count I while reserving its right to litigate (and avoid attorneys' fees on) Count II. This strategy would have entailed taking the risk that the relators would win and recover something on top of the $12 million (plus attorneys' fees beyond those incurred to the date of settlement). But [defendant] didn't take the risk of loss and therefore could not hope for the thrill of victory.

*Id*. at 938.

Applying *Fallon*, the court in *United States ex rel. Hernandez v. Therapy Providers*, No. 06-0760, 2014 WL 5282436 (N.D. Ill. Oct. 14, 2014), similarly rejected a defendant's "meritless" argument that 31 U.S.C. § 3730(d)(1) fees, costs, and expenses were unavailable because the relator was purportedly only "partially successful" where all the relator's FCA claims were released.  *Id*. at *3.  As the court explained, "when a *qui tam* case settles, like it did

here and in *Fallon*, the question before the Court is 'whether the [attorneys'] bill is reasonable, but not the question whether the United States (through the relators) prevailed on all counts." *Id.* at *4 (internal quotation marks omitted) (citing *Fallon*, 97 F.3d at 940).

The court in *U.S. ex rel. Poulton v. Anesthesia Assocs. of Burlington, Inc.*, 87 F. Supp. 2d 351 (D. Vt. 2000), reached a similar conclusion, rejecting an argument that fees, costs, and expenses under 31 U.S.C. § 3730(d)(1) were unavailable for work related to released claims. *See also id.* at 357. As the court there found:

> While reduction . . . is appropriate for hours spent on unsuccessful claims when the case has gone to trial and many claims are found to be not meritorious, such a reduction is not appropriate here. Settlement does not determine which claims are meritorious, and effective work by Plaintiff's attorneys on all claims serves as fuel for productive settlement discussions. FAHC chose to settle Dr. Poulton's fraud claims in exchange for the payment of $3 million to the government, and settled his retaliation claim in exchange for the payment of $400,000. Having made these choices, FAHC cannot now escape fee liability by arguing that certain claims were unsuccessful. Thus, no reduction for unsuccessful claims is warranted.

The present facts fit squarely within this precedent. All claims asserted by Relator Sanborn were released for valuable consideration – none were abandoned. Any assertion that reasonable fees, expenses, and costs are unavailable on claims Defendant bargained to release is incorrect as a matter of law. Moreover, any finding that Relator Sanborn is not entitled to fees, expenses, and costs on released-but-not-intervened claims would not only be wholly unsupported, but would undermine the False Claims Act's goal of encouraging individuals aware of government fraud to produce that information, and would discourage whistleblowers from identifying the very type of wrongdoing alleged by Relators here.

## III.   The Amount of Relator Sanborn's Fees, Expenses, and Costs Is Reasonable

Because the amount of Relator Sanborn's fees, expenses, and costs is wholly within reason and well within the range of reasonableness for a complex False Claims Act matter such as this case, that amount should be approved. As the leading practitioners whose declarations are

attached have opined, Schlichter Bogard & Denton's rates, which have been expressly approved by several federal courts within the last two years in complex contingent litigation matters, are reasonable, as are Schlichter Bogard & Denton's hours and expenses in this matter.

Statutory attorneys' fees and costs are generally determined by a lodestar methodology. *Hensley*, 461 U.S. at 433; *Blum v. Stenson*, 465 U.S. 886 (1984); *Averback*, 224 F. Supp. 2d at 350; *see also García-Rubiera v. Fortuño*, 727 F.3d 102, 116 (1st Cir. 2013) ("A district court can hardly go wrong in selecting the so-called lodestar method when called upon to determine how much of an attorneys' fee a losing defendant need pay a prevailing plaintiff"); *Coutin v. Young & Rubicam P.R. Inc.*, 124 F.3d 331, 337 (1st Cir. 1997) ("The lodestar method is the strongly preferred method by which district courts should determine what fees to award prevailing parties"). Although the Court has discretion to evaluate the reasonableness of the amount of attorneys' fees requested, the award of fees is mandatory. *Averback*, 224 F. Supp. 2d at 345.

The "lodestar" is the number of hours reasonably expended in the litigation multiplied by reasonable hourly rates. *Id.* at 348. There is a "strong presumption" that the lodestar amount is a reasonable fee. *Id.* at 350. Using the lodestar "produces an award that roughly approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case;" and it "cabins the discretion of trial judges, permits meaningful judicial review, and produces reasonably predictable results." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551–52 (2010).

A.   The Number of Hours Spent by Relator Sanborn's Attorneys Is Reasonable

The starting point for determining the amount of reasonable fees is the reasonable number of hours expended in the litigation. *Blum*, 465 U.S. at 888. "To determine the number of hours reasonably spent, one must first determine the number of hours actually spent and then

subtract from that figure hours which were duplicative, unproductive, excessive, or otherwise unnecessary." *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 950 (1st Cir. 1984).

Courts ordinarily should defer to the fee claimant's judgment as to the reasonableness of, and necessity for, the work. *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008) ("By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case"); *Norman v. Hous. Auth. of Montgomery*, 836 F.2d 1292, 1306 (11th Cir. 1988) ("The measure of reasonable hours is determined by the profession's judgment of the time that may be conscionably billed and not the least time in which it might theoretically have been done"). In a case such as this one – where Relator Sanborn did not lose any litigation claims, and recovered substantial relief for the government pursuant to the statute – counsel is entitled to compensation for <u>every</u> hour claimed. *See City of Riverside v. Rivera*, 477 U.S. 561, 569 (1986) (where action results in significant relief, <u>all</u> hours reasonably necessary to obtain the relief are compensable).

Over the course of approximately 3.5 years, Schlichter Bogard & Denton devoted 1,255 attorney and non-attorney hours to this case. Schlichter Decl. ¶33. These hours were reasonably necessary to complete the work described herein and to achieve a successful settlement of the matter. *Id*. ¶17. Each biller was well-qualified based on their skills and experience to perform the assigned tasks. *Id*. ¶¶1–16, 35.

In preparing the instant motion, Schlichter Bogard & Denton performed a line-by-line audit of its time records, eliminated all duplicative or erroneous billing entries, and eliminated time billed by attorneys who spent less than five hours working on the case and staff who spent less than 20 hours working on this case, and made other discretionary reductions in the amount of hours claimed. *Id.* ¶33–35. As a result of these exercises of billing discretion, Relator

14

Sanborn seeks compensation based only on 1,069.35 of the hours his attorneys have worked – a reduction of more than 185 hours, or approximately 15%. *Id.* Relator Sanborn likewise seeks reimbursement for time expended by just 8 of the 35 timekeepers who billed time to this matter – a reduction of more than 75%. *Id.* Additionally, Relator Sanborn seeks no compensation whatsoever for work performed by highly qualified Boston counsel in this matter. *Id.* ¶41.

The hours for which Relator Sanborn seeks reimbursement were approximately allocated to litigation tasks set forth below. *Id.* ¶39.

| Task | Hours | Percentage of Total |
|------|-------|---------------------|
| Initial investigation and preparation of complaint | 252.5 | 23.61% |
| Preparation of disclosures | 202.7 | 18.96% |
| Communications with government, including interviews | 116.2 | 10.87% |
| Supplemental disclosures | 78.6 | 7.35% |
| Attendance at hearings and preparation of filings | 22.8 | 2.13% |
| Consulting with experts | 7.6 | 0.71% |
| Conferring with co-counsel and local counsel | 33.2 | 3.10% |
| Legal and factual research and continuing investigation | 177.45 | 16.59% |
| Negotiations with government, defendant, other relators | 45.5 | 4.25% |
| Drafting, reviewing, editing settlement documents | 14.9 | 1.39% |
| Litigation regarding attorney fees (to date) | 117.9 | 11.03% |
| **Total hours** | **1069.35** | |

As multiple leading practitioners have opined in the attached declarations, these hours were entirely reasonable – particularly in light of the approximately 15% reduction in hours that Relator Sanborn has unilaterally imposed. Further, Schlichter Bogard & Denton has worked on this case on a contingent-fee basis. This payment structure incentivized Schlichter Bogard & Denton to work as efficiently as possible because there was no guaranteed payment; additional unproductive hours would be of no benefit to Relator or counsel.

B.    The Hourly Rate Requested for Relator Sanborn's Attorneys Is Reasonable

In determining reasonable hourly rates, courts "look[] to 'the prevailing market rates in the relevant community.'" *Perdue*, 130 S. Ct. at 1672 (quoting *Blum*, 465 U.S. at 895).

15

Relevant to this determination are (1) fee claimants' skills, knowledge, experience, and reputation forming the basis for claimed hourly rates; and (2) prevailing rates in the community for similarly qualified attorneys.  *Averback,* 224 F. Supp. 2d at 353; *Blum*, 465 U.S. at 895-96 n.11; *see also Calhoun v. Acme Cleveland Corp*., 801 F.2d 558, 560 (1st Cir. 1986) (relying on "information about fees customarily charged in the locality for similar legal services and information about the experience and billing practices of the attorneys in question").  Counsel is entitled to be compensated at market-based hourly rates, taking into consideration their specialized skills and experience, the contingent nature of the work, customary billing rates and the prevailing rates charged by attorneys of similar skills and experiences for comparable legal services.

Relator Sanborn seeks reimbursement based upon the following rates for Schlichter Bogard & Denton attorneys:  $1,060 per hour for attorneys with at least 25 years of experience, $900 per hour for attorneys with 15–24 years of experience, $650 per hour for attorneys with 5–14 years of experience, $490 per hour for attorneys with 0–4 years of experience, and $330 per hour for paralegals and law clerks.  Schlichter Decl. ¶46.  These rates have been specifically approved by numerous federal district courts across the country within the past two years. Schlichter Decl. ¶49 (citing *Henderson, et al. v. Emory University, et al.,* No. 16-2920-CAP, ECF No. 236, at 5 (N.D. Ga. Nov. 4, 2020); *Kelly v. Johns Hopkins Univ.*, No. 16-2835-GLR, 2020 WL 434473, at *6 D. (Md. Jan. 28, 2020); *Tussey v. ABB, Inc*., No. 06-04305-NKL, Doc. 869 (W.D. Mo. August 16, 2019); *Sims*, 2019 WL 1993519, at *3; *Cassell v. Vanderbilt Univ.*, No. 16-02086, Doc. 174 (M.D. Tenn. Oct. 22, 2019); *Bell v. Pension Comm. Of ATH Holding Co., LLC*, No. 15-02062, Doc. 380 (S.D. Ind. Sept. 4, 2019); *Clark v. Duke*, No. 16-01044, Doc. 166 (M.D.N.C. June 24, 2019)).  Indeed, courts in this District have, in recent years, awarded

fees to Schlichter Bogard & Denton in complex contingent matters based on these rates.  *See Tracey*, No. 16-11620, ECF No. 317; *see also Gordan*, 2016 WL 11272044, at *3 (D. Mass. Nov. 3, 2016) (awarding fees based on Schlichter Bogard & Denton's 2016 rates of $998 per hour for attorneys with at least 25 years of experience, $850 per hour for attorneys with 15–24 years of experience, $612 per hour for attorneys with 5–14 years of experience, $460 per hour for attorneys with 2–4 years of experience, and $309 per hour for paralegals).

 Moreover, while law firms customarily incrementally increase rates by at least $25–50 per hour per year, the compensation that Relator Sanborn seeks in this case is based on rates that have remained constant since 2019, further supporting the reasonableness of the requested rates. Schlichter Decl. ¶46.

Several factors contribute to the requested rates.  *First*, under Supreme Court authorities, to compensate for delay in payment, statutory attorneys' fees should be calculated using hourly rates current to the year of recovery.  *Perdue*, 559 U.S. at 555; *Missouri v. Jenkins*, 491 U.S. 274, 284 (1989).  Courts in the First Circuit award fees at current rates.  *See, e.g.*, *Connolly v. Harrelson*, 33 F. Supp. 2d 92, 98 n.5 (D. Mass. 1999) ("[A]warding fees based upon current billing rates, as the Court does in this case, is one accepted means of compensating for a delay in payment[.]").

*Second*, counsel's reasonable hourly rates must reflect the market treatment for experienced attorneys with specialized skills necessary to litigate this *qui tam* case.  *See Blum*, 465 U.S. at 890 (special qualifications justifies higher rates based upon market treatment).  Such specialized skills and experience are essential to *qui tam* cases.

*Third*, Schlichter Bogard & Denton's approved rates are comparable to, if not less than, those of other False Claims Act practitioners, both in Boston and across the country, which have

risen significantly over the past decade.  Schlichter Decl. ¶51, Declaration of Jeremy L. Friedman ("Friedman Decl.") ¶¶27–28, Declaration of Suzanne Durrell ("Durrell Decl.") ¶ 19–27.  Survey data, court filings and industry reports strongly suggest that reasonable rates for this matter would be significantly higher than the amount sought by Relator Sanborn's counsel here.  Durrell Decl. ¶¶21–28 (citing reports of partner hourly rates from $1,025 to $1,550, a third-year associate rate above $600 per hour, and paralegal rates up to $565 per hour); Friedman Decl.¶27 (citing nationwide rates for top firms above $1,500 for partners and above $1,000 per hour for associates).  For example, a Boston-based partner at Hogan Lovells reported a billing rate in 2021 of $1,235.  Durrell Decl. ¶25.  As early as 2016 (i.e., five years ago), Boston-based Ropes & Gray LLP attested to partner hourly rates for partners with law school graduations in the 1980s of up to $1,450 per hour.  Friedman Decl. ¶28.  Likewise, McDermott Will & Emery LLP in 2020 reported rates for partners with over 30 years of experience ranging from $1,325–$1,410 and, for those with 10–15 years of experience, $1,135–$1,195.  *Id*., ¶32.  Indeed, "relator's counsel must be able to match up legal skills with an ever-increasing experienced, and usually well-financed, False Claims Act defense bar" and must "understand and reconcile complex and sometimes conflicting interests between and among the various parties, including the government (represented by attorneys at both the Department of Justice and in the United States Attorneys' offices)." *Id*. ¶13.

*Fourth*, as Congress was keenly aware, to represent a reasonable rate, fees paid to counsel working on a contingent basis must reflect market treatment for contingent risk.

> [A] true marketplace rate in a False Claims Act case would be what competent counsel's expectations of an hourly rate would be at the time of the filing of the case understanding that payment will be made only after success is achieved, and only after the defendant is given the opportunity to challenge the amount requested, and where the judge or an appellate court may reduce the amount required, and where payment may not come until this process is concluded. In such cases, that

<u>rate would be substantially greater than a rate where payment was guaranteed on a
monthly basis regardless of whether the case was won or lost</u>.

House Report, 132 Cong. Rec. H9382_03, 1986 WL 786917 (Cong. Rec.) (emphasis added).

These marketplace realities are a matter of record.  *See* Declaration of James Sturdevant, ¶10.

Considering the contingent risk of this lengthy complex litigation, a fully reasonable fee

according to the expectations of these trial lawyers would be a multiple of the claimed rate.  To

facilitate the resolution of this fee petition, however, Relator Sanborn is requesting rates that are

consistent with, not "substantially greater" than, rates paid to lawyers "where payment was

guaranteed on a monthly basis regardless of whether the case was won or lost."[1]

 C. <u>Relator Sanborn's Expenses and Costs Are Reasonable</u>

 Under section 3730(d)(1), Relator Sanborn is entitled to "receive an amount for

reasonable expenses which the court finds to have been necessarily incurred, plus reasonable

attorneys' . . . costs."  As detailed in the attached declaration, and documented in the exhibits

thereto, counsel necessarily and reasonably incurred $15,125.33 in costs and expenses in this

case.  Schlichter Decl. ¶55, Ex. 3.  These expenses were necessary to investigate Defendant's

fraud, to analyze the data, and to prepare the complaint necessary to plead with particularity the

scheme's details.

 The attached documentation lists each cost item, the dates that expenses were incurred,

and the amount paid out of pocket.  Additionally, testimony supports the necessity of the cost

item and explains the nature of the expenses.  These records were maintained according to

---

[1] Relators have served discovery regarding Defendant's time records and billing rates. As
Relator anticipates that Defendant will challenge the reasonableness of Relator's counsel's fees,
Relator believes that such information from Defendant will inform the Court as to the
reasonableness of Relator's requested fees.

Schlichter Bogard & Denton's internal accounting procedures, and Relator Sanborn can file or otherwise disclose additional documentation for such costs at the Court's direction.

IV.      Relator Sanborn Is Entitled to Fees for Preparation of His Fee Request

As with other fee-shifting statutes, under the False Claims Act relators' counsel is entitled to fees for work establishing, and collecting, reasonable fees.  As explained by the First Circuit: "It would be inconsistent with the purpose of [statute] to dilute a fees award by refusing to compensate the attorney for the time reasonably spent in establishing and negotiating his rightful claim to the fee."  *Lund v. Affleck*, 587 F.2d 75, 77 (1st Cir. 1978); *see also Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 981-983 (9th Cir. 2008) ("fees on fees" must be determined by the same lodestar methodology, and downward adjustments are to be used only in "rare" cases).

Relator Sanborn's counsel has been required to exert time and expense in continued attempts to negotiate with Defendant relating to Relator Sanbor's contractual and statutory right to attorneys' fees and expenses under 31 U.S.C. § 3730(d).  Unless and until Defendant agrees to pay Relator Sanborn's reasonable attorneys' fees, additional work will be required to claim and recover fees.  Under the statutory scheme and settled case law, such fees must be charged to Defendant.

Relator Sanborn's counsel intends to update its billing records with additional time and submit those records to the Court during these fee proceedings.

**CONCLUSION**

For the foregoing reasons, Sanborn respectfully requests that the Court order Defendant pay Sanborn his reasonable expenses, attorneys' fees, and costs.

Date: April 9, 2021                        Respectfully submitted,

                                           **RELATOR GEORDIE SANBORN**

                                           By: /s/ Andrew D. Schlichter
                                           Andrew D. Schlichter*
                                           Joel D. Rohlf*
                                           Schlichter Bogard & Denton LLP
                                           100 South Fourth Street, Suite 1200
                                           St. Louis, Missouri 63102
                                           (314) 621-6115
                                           aschlichter@uselaws.com
                                           jrohlf@uselaws.com

                                           *pro hac vice

                                           Stephen S. Churchill, #564158
                                           Fair Work, P.C.
                                           192 South Street, Suite 450
                                           Boston, MA 02111
                                           Tel:  (617) 607-3260
                                           Fax:  (617) 488-2261
                                           steve@fairworklaw.com

                                           *Counsel for Relator Sanborn*

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and paper copies will be sent to those indicated as non-registered participants on April 9, 2021.

<u>/s/ Andrew D. Schlichter</u>