UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. Geordie Sanborn, Cheryl Lovell, and William McKusick,<br><br>               Plaintiffs,<br>v.<br><br>ATHENAHEALTH, INC.,<br><br>               Defendant. | No. 17-cv-12125-NMG<br>No. 17-cv-12543-NMG |

**DEFENDANT ATHENAHEALTH'S OPPOSITION TO
RELATOR SANBORN'S MOTION FOR REASONABLE EXPENSES,
ATTORNEYS' FEES, AND COSTS PURSUANT TO 31 U.S.C. § 3730(d)(1)**

Defendant athenahealth, Inc. ("Athena") opposes the motion of Relator Geordie Sanborn ("Sanborn") for attorneys' fees, costs, and expenses. As discussed more fully below, Athena does not dispute that Sanborn is entitled to receive a portion of his claimed attorneys' fees and costs arising from the settlement of this action under the fee-shifting provision of the False Claims Act ("FCA"), 31 U.S.C. § 3730(d)(1). It is Sanborn's burden, however, to establish the reasonableness of his fees in this case where the government conducted the investigation, intervened as to three issues giving rise to allege violations of the Anti-Kickback Statute and negotiated a settlement with Athena. He cannot carry the burden of proving that the more than $750,000 he seeks is reasonable where a large portion of his time entries relate to a claim in which the government did not intervene and recovered nothing, the billing records he has submitted do not sufficiently identify the claims on which the attorneys' time was spent, and where his records include excessive and redundant entries and inappropriate charges such as non-productive travel time, expert costs, and time spent negotiating the relator's share.

1

Any award of fees and costs to Sanborn should not exceed $200,000. This is the only portion of his fee claim that could possibly be related to the claim in which the government intervened and is otherwise reasonable.

## BACKGROUND

On October 30, 2017, Sanborn filed a *qui tam* complaint under seal alleging first, that Athena paid kickbacks to customers to induce sales of its electronic health record ("EHR") technology in violation of the Anti-Kickback statute (the "AKS claim"). *See* ECF No. 1.[1] Specifically, Sanborn alleged that Athena paid kickbacks to current and potential customers through its various marketing programs and that these alleged violations of the AKS constituted FCA violations. ECF No. 1 ¶¶ 57–77. Second, Sanborn alleged that Athena falsely represented to the United States and its customers that Athena's EHR technology complied with applicable certification requirements, which false representations caused Athena customers to submit false claims for incentive payments under the Health Information Technology for Economic and Clinical Health ("HITECH") Act (the "certification claim"). *Id.* ¶¶ 78–111. The HITECH Act created incentive payments for providers that attested to having "meaningfully used" "certified" EHR technology. As Sanborn alleged in no fewer than 33 paragraphs in his complaint, Athena's EHR was certified for participation in the "meaningful use" program and its customers, almost all of which attested to use of a certified EHR, received the incentive payments. *Id.* Sanborn identified several ways in which, he alleged, Athena's EHR failed to satisfy the highly technical certification criteria. *Id.*

---

[1] Sanborn's AKS claim was comprised of two different sales and marketing issues. ECF No. 1 ¶¶ 57–77. As set forth below, he later disclosed a third sales and marketing related issue to the government. *See* Walters Aff. ¶ 7. Also as set forth below, the two issues set forth in his complaint and the third issue later disclosed to the government were the basis of the AKS claim in which the government intervened. The certification claim in Sandborn's complaint also included multiple different issues allegedly related to the certification and functionality of Athena's EHR. ECF No. 1 ¶¶ 78–11. For simplicity purposes, we refer to the different issues related to each claim as the singular "AKS claim" and "certification claim."

2

The government (specifically, the US Attorney's Office for the District of Massachusetts and the Department of Justice's Civil Division) investigated Sanborn's allegations over the course of approximately two years, during which time Sanborn's complaint remained under seal. Walters Aff. ¶ 3. The government's investigation was active, and included requesting and receiving more than 1.8 million documents, and meeting and negotiating with counsel for Athena regarding substantive issues. Id. ¶ 4. Although the government did initially request documents and information regarding the certification process for Athena's EHR technology, all of its substantive questions for, and discussions with, Athena's counsel related to Athena's marketing programs and issues that, in the government's view, presented potential AKS violations. Id. ¶¶ 3–4. Athena's counsel had no substantive dealings with Sanborn's counsel until after the agreement in principle was negotiated with the government. Id. ¶ 5.

That agreement in principle was reached between Athena and the government on September 22, 2020. Id. ¶ 6. After lengthy negotiations with the government concerning certain settlement details having nothing to do with Sanborn, and in which Sanborn and his counsel were not involved, the government filed its Complaint-in-Intervention on January 25, 2021, ECF No. 60, and the settlement agreement in this matter was signed on January 27, 2021. Schlichter Decl. Ex. 1.

The Complaint-in-Intervention, the allegations of which are incorporated into the settlement agreement as "Covered Conduct," alleged violations of the FCA based solely on conduct associated with three of Athena's marketing programs, which the government alleged violated the AKS (referred to collectively as the AKS claim). ECF No. 60 ¶¶ 71–74. There was no claim related to the certification, or functionality, of Athena's EHR.[2]

---

[2] As background, Sanborn filed his complaint after a landmark settlement was announced involving one of Athena's competitors, eclinicalWorks LLC ("eCW"). Specifically, in May 2017, eCW settled a FCA action, which included

3

Pursuant to the settlement agreement, Athena paid $18,250,000 to the government, and Sanborn agreed to release all of his claims, with the exception of his claim for attorneys' fees and costs. Schlichter Decl. Ex. 1. ¶¶ 1, 3.[3]

## ARGUMENT

Sanborn's fee claim is bloated, includes substantial fees related to work on the unsuccessful certification claim, and is evidenced by billing records that do not satisfy the requirements of the FCA.

The relevant relator's share and fee provision of the FCA provides:

> If the Government proceeds with an action brought by a person under subsection (b), such person shall, subject to the second sentence of this paragraph, receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action. … Any payment to a person under the first or second sentence of this paragraph shall be made from the proceeds. Any such person shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant.

31 U.S.C § 3730(d)(1); *U.S. ex rel. Allstate Ins. Co. v. Millenium Laboratories, Inc.*, 464 F. Supp.3d 449, 453 (D. Mass. 2020) (discussing fee-shifting provision). The law is clear: only "prevailing" relators are entitled to attorneys' fees and costs under the FCA's fee-shifting provision. *See, e.g.*, *U.S. ex rel. Zediker v. OrthoGeorgia*, 407 F. Supp. 3d 1330, 1349–50 (M.D.

---

claims regarding the false certification of eCW's EHR and violations of the AKS. eCW paid more than $150 million to the government to settle those claims. *See https://www.justice.gov/opa/pr/electronic-health-records-vendor-pay-155-million-settle-false-claims-act-allegations*. Following the eCW settlement and prior to the Athena settlement, another EHR provider, Greenway Health LLC ("Greenway"), settled similar claims for more than $55 million. *See https://www.justice.gov/opa/pr/electronic-health-records-vendor-pay-5725-million-settle-false-claims-act-allegations*. The Athena settlement, which only included the AKS claim, obviously involved a much smaller recovery for the government than the eCW and Greenway settlements that included claims regarding improper certification.

[3] Relators Cheryl Lovell and William McKusick also filed a related complaint a few months after Relator Sanborn, on December 22, 2017, under docket number1:17-cv-12543. ECF No. 2. The cases were consolidated under the above-captioned case number. Relators Lovell and McKusick have separately moved for attorneys' fees pursuant to 31 U.S.C. § 3730(d)(1). As discussed in its opposition to Lovell and McKusick's fee petition, Athena opposes that claim for attorneys' fees in its entirety.

Ga. 2019). Where, as here, the government has not recovered on a claim and it is not part of the covered conduct released by the government in a settlement agreement, the relator has not prevailed as to that claim and is not entitled to attorneys' fees and costs incurred in connection with work on the unsuccessful claim. *See id.*

More specifically, courts in the First Circuit use the lodestar methodology when determining the "reasonable" fees and costs to be awarded to a prevailing relator in a FCA action. *See, e.g.,United States ex rel. Emery v. Belcon Enterprises, Inc.*, No. 2:14-cv-00483-DBH, 2016 WL 7494855, at *2–8 (D. Me. 2016) (*citing Matalon v. Hynnes*, 806 F.3d 627, 638 (1st Cir. 2015) (applying lodestar methodology). Under the lodestar approach, the court determines the reasonable amount of time expended on the matter multiplied by the prevailing hourly rate. *Id.* The relator, of course, bears the burden of establishing the reasonableness of <u>both</u> the work done and the rate charged—thus any hours deemed excessive, redundant, or otherwise unnecessary are excluded under the lodestar methodology. *Id.*; *see also Lipsett v. Blanco*, 975 F.2d 934, 937 (1st Cir. 1992); *U.S. ex rel. Averback v. Pastor Medical Assoc. P.C.*, 224 F. Supp. 2d 343, 353–56 (D. Mass. 2002). Hours spent on claims that are entirely unrelated to the successful claims in the Covered Conduct—as the certification claim is here—are deducted from the overall fee award. *See Zediker*, 407 F. Supp. 3d at 1349–50. Similarly, fees associated with time entries that are vague, excessive and/or redundant will be excluded. *Belcon Enterprises, Inc.*, 2016 WL 7494855, at *2–8.

Sanborn, as he makes clear in his motion, is seeking fees and costs related to work on his unsuccessful certification claim. And while Sanborn claims to have reduced his counsel's invoices slightly (based on some undefined exercise of "billing discretion"), he still seeks reimbursement for time spent by seven different attorneys and a paralegal, nonproductive travel time, an

5

unnecessary and unidentified expert, and even time negotiating his share of the settlement proceeds with the other relators. Br. at 14–15. In sum, Sanborn has not, and indeed cannot, carry his burden to establish that his claim of $761,828.50 in fees and $15,125.33 in costs is reasonable. After eliminating the unnecessary, excessive and redundant fees and costs, Sanborn is entitled to no more than $200,000.

**I.    Sanborn is Not Entitled to Fees and Costs Related to His Unsuccessful Certification Claim**

A.   Sanborn's Certification Claim Was Not Successful

Sanborn is not entitled to recover fees and costs associated with time spent on his unsuccessful certification claim. *See* § 3730(d)(1); *see, e.g.*, *U.S. ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 786 F. Supp. 2d 110, 118 (D.D.C. 2011) (citations omitted) ("[N]o compensation should be paid for time spent litigating claims upon which the party seeking the fee did not ultimately prevail."). A relator is not considered to have prevailed on a claim in which the government did not intervene and for which no money was recovered. *See Zediker*, 407 F. Supp. 3d at 1349–50. Under these circumstances, associated fees and costs are not recoverable as a matter of law. *See id.* As the Supreme Court held in *Hensley v. Echerhart*, the lodestar amount "may be adjusted downward depending on the results obtained." 461 U.S. 424, 434 (1983). Applying these principles, courts routinely reduce claims for attorneys' fees and costs "if the prevailing party was [only] partially successful in its efforts." *Zediker,* 407 F. Supp. 3d at 1350 (downward adjustment of the lodestar amount may be "merited . . . if the prevailing party was partially successful in its efforts"); *see also United States v. Everglades Coll., Inc.*, 855 F.3d 1279, 1293 (11th Cir. 2017); *United States ex rel. Jacobs v. CDS, P.A.*, No. 4:14-cv-00301-BLW, 2018 WL 6268201, at *5 (D. Idaho 2018).

In determining whether and how to reduce demands for fees where a relator has been only partially successful, courts consider two factors: (1) whether the successful and unsuccessful

claims were interrelated; and (2) whether "the plaintiff achieved a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award." *Bill Harbert Int'l Const., Inc.*, 786 F. Supp. 2d at 117–18 (citing *Hensley*, 461 U.S. at 434) (applying analysis articulated in *Hensley* when determining the appropriate fee award for a partially successful relator in a FCA case); *Zediker,* 407 F. Supp. 3d at 1349–51 (applying *Hensley* analysis in FCA case that ended in settlement). If, in considering the first question, the court determines that there are "natural dividing lines" between the facts and legal issues of the claims, "the Court [should] immediately strik[e] fees incurred in pursuit of claims that are both unrelated and unsuccessful." *Bill Harbert Int'l Const., Inc.*, 786 F. Supp. 2d at 118. If such "ready distinctions" do not exist, the court should then turn to the second question and weigh the outcome of the suit against the efforts expended by counsel on the unsuccessful claim. *Id.*

In response to the first question, Sanborn's two claims are *not* interrelated – they rely on completely separate facts and legal theories and can be readily separated. *Compare U.S. ex rel. Chiba v. Guntersville Breathables, Inc.*, 421 F. Supp. 3d 1241, 1264 (N.D. Ala. 2019) (declining to apply a downward adjustment of the lodestar amount where successful and unsuccessful claims were part of an "interrelated scheme") *with Zediker*, 407 F. Supp. 3d at 1350 (describing unsuccessful claims brought by relator as "[un]related to what the [g]overnment ultimately brought as claims against [defendant]" and "based on separate legal theories from those on which the parties ultimately settled" and denying the relator's request for additional fees).

Sanborn's AKS claim—the only one in which the government intervened and was part of the Covered Conduct in the settlement agreement—was based entirely on Athena marketing programs, and focused specifically on certain referral payments made to customers and others and alleged "gratuities" provided to customers to induce them to purchase Athena's EHR. ECF No. 1

7

¶¶ 57–77. Sanborn claimed that these marketing programs violated the AKS and served as the basis for a FCA violation. *Id.* ¶¶ 115–16. Sanborn's certification claim, on the other hand, related to the technical details of Athena's EHR technology and its compliance with applicable certification criteria. *Id.* ¶¶ 78–111. Sanborn alleged that Athena made false representations regarding the EHR technology's compliance with applicable certification criteria, causing the government to pay improper "meaningful use" incentive payments for the use of EHR technology. *Id.* ¶¶ 117–22. The claims are wholly unrelated. Sanborn is therefore not entitled to recover fees related to his unsuccessful claim.

Even if, contrary to law and fact, the AKS and certification claims were not so distinct such that they could be easily separated, a reduction in Sanborn's fees would still be warranted because he only achieved partial success and the effort Sanborn expended in relation to his certification claim did not contribute to the success of the AKS claim. *Bill Harbert Int'l Const., Inc.*, 786 F. Supp. 2d at 118; *see also U.S. ex rel. Chiba*, 421 F. Supp. 3d at 1264 (noting that the relators correctly "excised [] hours from their fee request to reflect the dismissal of [] non-intervened, non-settled claims"). Although the government did initially request documents and information regarding the certification process for Athena's EHR technology, the government substantively engaged with Athena's counsel only on potential AKS violations related to Athena's marketing programs. Walters Aff. ¶¶ 3–4. Furthermore, the settlement agreement only discusses the AKS claim, therefore any "success" achieved by Sanborn can only be attributed to the AKS claim. Schlichter Decl. Ex. 1. As defined in the Covered Conduct, the payment Athena made under the settlement agreement is solely for the AKS claim and not for the certification claim or any issues related to the certification or functionality of its EHR. *Id.* ¶ D. Sanborn agreed, however, to dismiss all of his claims—including the certification claim—against Athena with prejudice. *Id.* at

¶ 3. Sanborn was not successful in any aspect of his certification claim—a highly technical claim that took up the most space in his complaint—and he only received a relator's share for the AKS claim. Sanborn is therefore not entitled to fees for time spent on the certification claim.

Indeed, in *Averback*, which Sanborn cites, Judge Young explicitly stated that courts using the lodestar methodology should "discount claimed hours by excluding time spent on unsuccessful claims that [are] not related to the successful ones and can be easily severed" and that it "may, but need not, eliminate claims for hours spent on unsuccessful but interconnected claims." 224 F. Supp. 2d at 351. In that case, Judge Young, in his discretion, discounted the fees in other ways and did not consider the success, or lack thereof, of the claims pursued before awarding a total of $61,759.90 in fees and costs to relator's counsel—a fraction of what Sanborn's counsel seeks here.[4] But he also was clear that, when using the lodestar methodology, and determining reasonableness of the fees claimed, time spent on unrelated unsuccessful claims should be deducted. *Id.*

Another case relied on by Sanborn, *U.S. ex rel. Poulton v. Anesthesia Assocs. of Burlington, Inc.*, recognizes that reductions for unsuccessful clams are appropriate. 87 F. Supp. 2d 351, 357 (D. Vt. 2000). In *Poulton,* however, the defendant made payments for *both* of relators' claims. Notwithstanding the fact that the relator had *prevailed* on both claims, the *Poulton* defendants argued that the relators' fee award should be reduced because one of the claims was "non-meritorious." The court declined to reduce the fees. The court acknowledged that the defendants' payments, which were tied to both claims, may not have been a determination of merit. But the

---

[4] Sanborn embraces a footnote in *Averback* in which Judge Young compared different methodologies for assessing fee awards, the lodestar approach and the Model Code approach. 224 F. Supp. 2d at 351 & 349–50, n.7. As he noted in his opinion, the Model Code approach includes explicit factors to determine a reasonable fee, including the success or lack thereof on a particular claim, and that the lodestar approach, while more flexible, also may require the court to "exclude[] time spent on unsuccessful claims that can easily be severed." *Id.* at 351.

9

payments demonstrated that the relatorshad been "successful" on both claims, which entitled the relator to the related fees. *Id.*

*U.S. ex rel. Fallon v. Accudyne Corp.*, 97 F.3d 937, 939 (7th Cir. 1996), and *United States ex rel. Hernandez v. Therapy Providers,* No. 06-0760, 2014 WL 5282436, *4 (N.D. Ill. Oct. 14, 2014) are, likewise, inapposite. In both cases the defendant *affirmatively agreed* to pay relators' reasonable fees and costs as part of the settlement agreement. *Fallon,* 97 F.3d at 939; *Hernandez,* 2014 WL 5282436, *4. The defendant in *Fallon* agreed to make a settlement payment for both intervened and non-intervened claims as well as attorneys' fees. Then, in an attempt to "weasel out" of its promise to pay fees, the defendant asserted a variety of arguments based on the merits of the case. 97 F.3d at 939. The court held that since the defendant had agreed to pay to settle both claims instead of litigating *and* had agreed to pay attorneys' fees when it could have left the settlement agreement silent on that point, the defendant could not challenge the relators' entitlement to fees related to all claims. *Id.* The court noted that the issue was not, as it is in the present case, whether the relators "prevailed" on the non-intervened claim—the relator "plainly [] did" as evidenced by the defendant's agreement to make a settlement payment for the claim. *Id.* Rather, the only question left to consider in *Fallon* was whether the fees claimed in connection with all claims were otherwise reasonable. *Id.* The defendants in *Hernandez* similarly argued that the amount of requested attorneys' fees should be reduced because relator was only partially successful on her claims. 2014 WL 5282436, *4. The court, citing *Fallon*, rejected this argument because the defendant had explicitly agreed to pay fees as part of the settlement agreement, thereby conceding that the defendant had prevailed on, and was entitled to fees in connection with, all claims. *Id.*

Athena only agreed to pay to settle the intervened AKS claim and did not affirmatively

10

agree to pay Sanborn's attorneys' fees and costs as part of the settlement agreement. While Athena does not dispute that Sanborn is entitled to fee and costs related to his AKS claim, Sanborn still bears the burden of proving his statutory entitlement to fees related to his certification claim, which hinges on the success of the claim. Athena made a payment in connection with only the intervened AKS claim, which are entirely unrelated to the certification claim. Further, Athena admitted no wrongdoing as to *any* claim and *did not* agree, in any way, to pay Sanborn's attorneys' fees and costs. All of these factors distinguish this matter from the cases cited by Sanborn in support of his assertion that he is entitled to fees in connection with all work on all claims, without regard to his success on those claims. More importantly, the weight of the authority dictates that Sanborn cannot recover for fees associated with unsuccessful claims—fees associated with unsuccessful claims are not reasonable under the lodestar methodology. *See, e.g., Fallon*, 97 F.3d at 939; *Zediker,* 407 F. Supp. 3d at 1349–51.

   B.   <u>The Court Should Reduce Sanborn's Entire Fee Claim by 70%</u>

Sanborn was only partially successful on his claims. The fees he can recover therefore must also be reduced. In circumstances where a party is only partially successful, the court may either attempt to identify and eliminate specific hours spent on unsuccessful claims or reduce the award by some proportion. *Zediker*, 407 F. Supp. 3d at 1350 (citations omitted); *United States ex rel. Becker v. Shaw Univ.*, No. 5:16-CV-4-BO, 2019 WL 2504074, at *3 (E.D.N.C. 2019) (determining that a reduction of fees was appropriate where the government intervened and settled only a fraction of the relator's original claims); *U.S. ex rel. Nichols v. Omni H.C., Inc.*, No. 4:02-cv-66(HL), 2009 WL 365615, at *4 (M.D. Ga.) (determining that 50% reduction in fees was appropriate in FCA settlement case where 75% of relator's claims were dismissed but some claims were related). Here, given the vagaries in the time entries submitted by Sanborn's counsel, the Court has no alternative but to reduce the fees by a percentage of time spent on the unsuccessful,

11

and yet highly technical, certification claim. For the reasons set forth below, the Court should reduce the overall fee claim by 70% to account for the time spent on that unsuccessful claim.

Sanborn's counsel block billed for the time spent on all aspects of this matter—meaning the descriptions do not distinguish between tasks—making it impossible to distinguish between work on the successful and unsuccessful claims, let alone assess the reasonableness of any given task or the overall fee request. *See Customs Fraud Investigations, LLC v. Victaulic Co.*, No. 13-2983, 2019 WL 4280494, at *7 (E.D. Pa. 2019) (reducing the attorneys' fee award where time entries were overly vague and did not provide enough information as to how the work conducted related to the case); *United States ex rel. Rai v. KS2 TX, P.C.*, No. 3:17-cv-834(JBA), 2019 WL 1397290, at *7–*9 (D. Conn. 2019) (reducing the lodestar amount in part due to "insufficiently specific time entries," which were "too vague for a court to determine the reasonableness of the time spent" and noting that courts have reduced fee awards where time entries "do not refer to the specific matter worked on"); *United States ex rel. Raggio v. Seaboard Marine, Ltd.* No. 1:10-CV-01908-BJR, 2017 WL 2591288, at *7 (D.D.C. May 4, 2017) (reducing total hours spent by an additional 20% due to block billing).

For example, Sanborn's counsel block billed 208 hours' worth of time over the course of approximately 6 weeks in connection with preparing the complaint and provided only vague, and often repetitive, descriptions of the work. "Prepare complaint, including review of materials and communications regarding same" was one description used by Attorney Schlichter to bill over 33 hours between September 1, 2017 and September 6, 2017, including one time entry for 12.7 hours (September 5) and one for 10.4 hours (September 6). Walters Aff. Ex. A[5]; *see also* Schlichter Decl. Ex. 2. Attorney Schwartz similarly blocked billed over 119 hours with the description

---

[5] Exhibit A to the Affidavit of Sarah E. Walters, filed in support of this opposition, contains examples of the type of deficient entries that appear throughout Sanborn's records and is not meant to be an exhaustive list.

"Further preparation of Complaint" between August 15, 2017 and September 22, 2017, with many time entries exceeding 5 hours. Walters Aff. Ex. A. Attorney Schwarz also used the description "Further preparation of disclosure statement" for over 36 hours' worth of time in October 2017. *Id.* This type of improper block billing and vague descriptions are found throughout the records submitted by Sanborn. Even if Sanborn had been successful on all of his claims, such undifferentiated block billing would not be recoverable. *See, e.g., Raggio*, 2017 WL 2591288 at * 7.

To determine an appropriate proportion, courts look to a number of mathematical and policy factors, including any gaps between what the plaintiff wanted to achieve and what they did achieve, whether defendants admitted wrongdoing, and whether any policy change by defendant related to the unsuccessful claim was required by the settlement. *United States ex rel. Foley v. Mitchell,* No 3:14-cv-135-RCL, 2019 WL 6134159, at *3-*4 (M.D. Ala. 2019) (determining that relator only partially prevailed on its claim where a court dismissed one claim and the other was settled for much less than originally sought; "defendants are correct that it would be unfair to require payment of 100% of the fees incurred throughout the lawsuit when relator did not prevail on 100% of his claims"); *Everglades Coll., Inc.*, 855 F.3d at 1293 (listing factors and noting that public benefit created as a result of the lawsuit does not foreclose reduction in lodestar amount)*; Jacobs*, 2018 WL 6268201, at *4–5.

Applying these factors, the Court should reduce Sanborn's fee recovery by 70%, down to $228,548 in fees for the work in connection with his unsuccessful certification claim. The government intervened in Sanborn's AKS claim, not his certification claim, and Athena only made a payment in connection with the AKS claim. As a result, the Court should start with a minimum reduction of at least 50% of the claimed fees. *See Foley*, 2019 WL 6134159 at *4 (reducing fees

13

award first by 50% since relator prevailed on only one of two claims before reducing further to account for other factors). Here, however, the Court should reduce the total fee award by an additional 20% because the unsuccessful certification claim was far more technical and complicated than the successful AKS claim. *See Zediker*, 407 F. Supp. 3d at 1351 (reducing lodestar amount by 70% due to lack of success where unsuccessful claims were factually and legally different). While Sanborn's AKS claim was fairly straightforward, as he simply recited the terms of several of Athena's public marketing programs, *see* ECF No. 2 ¶¶ 57–77, the certification claim required an in-depth review of Athena's EHR technology, its capabilities, and its alleged failure to meet certain certification criteria. *See id.* ¶¶ 79–89 (alleging that the EHR technology generates errors in continuity of care data); ¶¶ 90–97 (alleging that the technology froze, crashed, or operated so slowly that it became inoperable); ¶¶ 98–103 (alleging that the technology deleted and incorrectly input patient data). The increased complexity and nuance of the certification claim necessarily accounted for a greater proportion of Sanborn's counsel's time, and given the shortcomings in his counsel's time entries, Sanborn cannot carry his burden of showing otherwise.

The other policy considerations also require a substantial reduction in the fees. Sanborn failed in his much more significant claim—the claim that challenged the legitimacy of Athena's entire EHR. Again, Athena admitted no wrongdoing in connection with any aspect of the settlement, and there were no requirements that Athena make any changes to any aspect of its EHR. The $18,250,000 that Athena agreed to pay to settle the AKS claim also paled in comparison to other recent settlements that included claims regarding the certification and functioning of the EHR. *See supra* n. 1 (citing $155 million eCW settlement and $57 million Greenway settlement). Sanborn did not achieve what he set out to achieve and he cannot now charge Athena for work

related to a complicated, and yet entirely unsuccessful, claim.  A reduction of 70% of his claimed attorneys' fees is thus warranted.

**II.    Sanborn Cannot Recover Fees and Expenses that are Vague, Excessive, Redundant, Unnecessary, and/or Unsupported**

After reducing Sanborn's fee claim by 70% for time spent on Sanborn's unsuccessful certification claim, which brings Sanborn's fee claim to $228,548.50, the Court should further reduce the fee award down to no more than $200,000 because Sanborn's counsels' time entries are deficient in a number of other respects.  Again, Sanborn bears the burden of providing adequate documentation to show that both the hourly rate and time spent are reasonable.  *See* § 3730(d)(1).  Accordingly, vague entries that reflect excessive, redundant, unnecessary, and/or unsupported work should be excluded, in their entirety, from the fee award.  *Belcon Enterprises, Inc.*, 2016 WL 7494855, at *2–8 (reducing fees owed to a relator based on excessive billing for the drafting of the complaint, teleconferences concerning "case status," vague time entries, duplicated time entries for a single set of tasks, time billed incorrectly at attorney rather than paralegal rates, inclusion of administrative tasks that should be included in a law firm's overhead, entries described solely as "office work," and entries relating to claims against a party against whom the relator did not prevail); *see also Thompson v. Quorum Health Resources, LLC*, No. 1:06-CV-168, 2010 WL 2044542, at *3 (W.D. Ky. 2010) (determining that a 25% reduction in attorney's fees was warranted where documentation was insufficient to determine whether the hours billed were "duplicative or excessive").  Time billed for non-productive attorney travel time and for the expense of an unnecessary and unidentified expert should also be excluded. *Poulton*, 87 F. Supp. 2d at 357–58.

    A.    <u>Sanborn Cannot Recover for Vague, Excessive, or Redundant Entries</u>

Many of the descriptions in Sanborn's billing records are often vague and leave no way to

evaluate the reasonableness of time spent on certain tasks. For example, an attorney with 12 years of legal experience at the time billed for almost *100 hours'* worth of unspecified legal research, amounting to $14,089.95 in fees (after the 70% reduction for work related to the unsuccessful claim),[6] *after* the complaint was filed in 2017. Walters Aff. Ex. B at 2; *see also* Schlichter Decl. Ex. 2 (*see, e.g.,* November 14, 2017 through November 16, 2017 entries for Brian Bush with the description "[L]egal research regarding case discovery.")*;* Schlichter Decl. ¶ 16 (identifying Bush as a 2005 law school graduate). Given the sheer number of hours and seniority of the attorney who performed undefined and seemingly unnecessary research, the fees associated with that time are unreasonable and should be excluded in their entirety.

Other time entries are excessive or redundant, reflecting, among other things, multiple people billing for time spent "conferenc[ing] with attorneys and paralegals" regarding the case. These conferences alone generated almost $1,715 in fees *after* the 70% unsuccessful claim reduction.[7] Walters Aff. Ex. B at 1; *see also* Schlichter Decl., Ex. 2 (*see, e.g.,* September 29, 2020 time entries, November 16, 2020 time entries); *Lipsett*, 975 F.2d at 938–39 (noting that "a claim that several lawyers were required to perform a single set of tasks" should be greeted with "healthy skepticism"); *Belcon Enterprises*, 2016 WL 7494855, at *2–*8 (reducing fees in part due to duplicated time entries for a single set of tasks). The Court should also exclude these entries in their entirety.

As of April 9, 2021, the date Sanborn filed his fee petition, Sanborn purports to have spent over 140 hours on tasks related to attorneys' fees and the present fee petition, amounting to more than $98,000 of the total $761,000 fee claim. Walters Aff. Ex. B at 2–4; *see also* Schlichter Decl.

---

[6] This amount reflects the 70% reduction to account for the unsuccessful claims. The amount before reduction is $46,966.50
[7] The amount before the 70% reduction is $5,717.

16

Ex. 2. After the 70% reduction related to the unsuccessful claim, the fee petition fees are still $29,442.90. Sanborn has also suggested that he intends to submit additional documentation to account for any fees accrued after the April 9, 2021 filing—fees likely incurred in connection with briefing his argument that he should receive fees associated with, among other things, his unsuccessful certification claim. Br. at 20. Although Sanborn is entitled to recover fees for time spent on negotiating attorneys' fees and filing the present fee petition, he still bears the burden of demonstrating the reasonableness of the fees he requests. *See Graves v. Plaza Med. Centers, Corp.*, No. 1:10-23382-CV, 2018 WL 3699325, at *11 (S.D. Fla. May 23, 2018). More than 140 hours and counting is not a reasonable amount of time to spend on attorneys' fees issues, especially given the extensive experience of Sanborn's counsel on FCA matters, as detailed in Sanborn's brief and accompanying declarations. *Zediker*, 407 F. Supp. 3d at 1347 (finding even 52.8 hours claimed on fee petition alone to be excessive). As such, the Court should reduce Sanborn's recovery for fees related to attorneys' fees negotiation and petition down to $20,000.

 B. <u>Sanborn Cannot Recover for Non-Productive Attorney Travel Time or Unnecessary Expert</u>

Sanborn's attorney billed at least 25 hours for non-working travel time, amounting to $6,750 in fees *after* the 70% unsuccessful claim reduction.[8] Walters Aff. Ex. B at 4; *see also* Schlichter Decl. Ex. 2 (*see, e.g.*, Andrew Schlichter's November 19, 2017 entry for 6 hours for "Travel to Boston for meeting" and similar entries on November 20, 2017, December 11, 2019 and December 12, 2019). Courts have repeatedly deemed such fees unrecoverable. *Customs Fraud*, 2019 WL 4280494, at *8; *Poulton*, 87 F. Supp. 2d at 357–58 (reductions for "non-productive travel time" were appropriate). The Court should exclude the entirety of this travel time from its lodestar calculation.

---

[8] The amount before the 70% reduction is $22,500.

Sanborn has also requested $8,500 in costs for an expert without providing any explanation of who the expert was or the individual's qualifications, the work performed, or why that work was needed. Walters' Aff. Ex. B at 4; *see also* Schlichter Decl. Ex. 2; *see Averback*, 224 F. Supp. 2d at 356 (subtracting a fee requested for an expert where the fee was not "backed up with disclosure of the expert's billing rate, qualifications, [and] explanation of the nature of the review conducted or justification for the review"). Indeed, it is impossible to imagine why Sanborn's counsel—self-proclaimed experts in FCA cases—needed an expert for any aspect of this case.[9] This vague and unsupported expense should be excluded from the lodestar amount.

    C.    <u>Sanborn Cannot Recover Fees Associated with Negotiating Relator's Share</u>

Sanborn also appears to be claiming at least 18 hours' worth of fees, equating to $3,724.50 in fees after the 70% unsuccessful claim reduction,[10] for time spent negotiating relators' share issues. Walters Aff. Ex. B at 4–5; *see also* Schlichter Decl., Ex. 2 (*see, e.g.,* September 28, 2020, Joel Rohlf billed 3.9 hours on "research regarding legal issues related to potential settlement and relators share"; December 15, 2020, Joel Rohlf spent 3.1 hours "draft[ing] bullet points for negotiations with the government regarding relators share."). Such fees are not recoverable under the FCA's fee-shifting provision. See *United States ex rel. Educational Career Dev., Inc. v. Central Fla. Reg'l Workforce Dev. Bd., Inc.*, No. 6:04-CV-93-ORL-19DABC, 2007 WL 1601747, at *5 (M.D. Fla. June 1, 2007) (holding that fees associated with negotiation of relator's share of settlement not recoverable). Indeed, the fact that Sanborn and his counsel have attempted to sneak such clearly unrecoverable fees into his petition is telling and consistent with the overall

---

[9] There also could have been no need for an expert in support of an AKS case based on uncomplicated marketing programs. While Sanborn has provided literally no information regarding the expert, it is safe to assume that any expert was most likely retained in connection with the technical certification aspect of the case, and the associated expense should be excluded as related to the unsuccessful claim as well.

[10] The amount before the 70% reduction is $12,415.

approach—it is clearly their intent to have Athena pay fees far beyond what is contemplated under the fee-shifting provisions of the FCA.  Sanborn cannot be allowed to do that.

With the 70% reduction in the overall fees, and the additional reductions detailed here, Sanborn is entitled to only $182,268.95 in fees, as well as $6,625.33 in costs (the entirety of the costs claimed minus the $8,500 for the undefined, and unnecessary, expert).

## CONCLUSION

For the reasons set forth above, Sanborn's motion for $776,953.83 in attorneys' fees, costs, and expenses (plus additional fees not yet incurred in connection with further briefing of his fee petition) should be denied.  Sanborn should recover no more than $200,000 in fees, costs, and expenses.

Date: May 14, 2021

Respectfully submitted,

*/s/ Sarah E. Walters*
Mark W. Pearlstein (BBO #542064)
Sarah E. Walters (BBO #638378)
Natasha L. Dobrott (BBO #705287)
MCDERMOTT WILL & EMERY LLP
200 Clarendon Street, Floor 58
Boston, Massachusetts 02116
Tel: (617) 535-4000
mpearlstein@mwe.com
sewalters@mwe.com
ndobrott@mwe.com

*Counsel for athenahealth, Inc.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 14th day of May 2021, a true and correct copy of the foregoing Opposition to Motion for Attorneys' Fees was served by electronic means through the ECF filing system, concurrent with the filing of this document, to:

David J. Derusha
United States Attorney's Office
One Courthouse Way, Suite 9200
Boston, MA 02210
617.748.3100
david.derusha@usdoj.gov

Stephen S. Churchill
Fair Work, P.C.
192 South Street, Suite 450
Boston, MA 02111
617.607.3260
steve@fairworklaw.com

Jessica J. Weber
United States Attorney's Office
One Courthouse Way, Suite 9200
Boston, MA 02210
617.748.3303
jessica.j.weber@usdoj.gov

Suzanne E. Durrell
Whistleblower Law Collaborative
20 Park Plaza, Suite 438
Boston, MA 02116
617.371.0936
suzanne@whistleblowerllc.com

Nicholas C. Perros
United States Department of Justice
Commercial Litigation Branch
175 N Street, NE, # 9.117
Washington, DC 20002
202.616.2629
Email: nicholas.c.perros@usdoj.gov

Andrew Schlichter
Schlichter Bogard & Denton
100 South Fourth Street, Suite 1200
Saint Louis, MO 63102
314.884.7681
aschlichter@uselaws.com

/s/ Sarah E. Walters
Sarah E. Walters