**United States District Court**
**District of Massachusetts**

```
_____
                                )
United States of America,       )
                                )
          Plaintiff,            )
                                )
     v.                         )
                                )   Civil Action No.
AthenaHealth, Inc., et al.,     )   17-12125-NMG
                                )
          Defendants.           )
_____ )
```

**MEMORANDUM & ORDER**

**GORTON, J.**

This dispute over attorneys' fees and costs arises from the settlement of two qui tam actions brought against defendant AthenaHealth, Inc. ("Athena" or "defendant") pursuant to the False Claims Act ("the FCA"), 37 U.S.C. § 3729 et seq.  The first action was filed by relator Geordie Sanborn in October, 2017, alleging violations of the FCA and the federal anti-kickback statute ("the AKS"), 42 U.S.C. § 1320a-7b.  Two months later, relators William McKusick and Cheryl Lovell filed a second qui tam action against Athena, alleging violations of the same statutes.

In January, 2021, the government intervened in some, but not all, of the relators' claims and shortly thereafter entered into an agreement with Athena to settle the action ("the Settlement Agreement") for approximately $18.25 million, a

-1-

portion of which was set aside for Sanborn as a relator's share. See 31 U.S.C. § 3730(d). Sanborn, McKusick and Lovell separately agreed to divide that share among themselves.

The Settlement Agreement reserved to relators the right to seek reasonable expenses, costs and attorneys' fees from Athena to the extent provided for by the FCA. See 31 U.S.C. § 3730(d). After unsuccessful negotiations, relators filed the pending motions for such funds which Athena opposes. For the reasons that follow, the motion of relators McKusick and Lovell (Docket No. 82) will be denied. The motion of relator Sanborn (Docket No. 77) will be allowed, in part, and denied, in part.

## I.   **Background**

### A. The False Claims Act and the Anti-Kickback Statute

The FCA is among the government's "primary litigative tool[s] for combatting fraud" concerning public funds. United States v. Millennium Labs., Inc., 923 F.3d 240, 244 (1st Cir. 2019) ("Millennium I") (citing S. Rep. No. 99-3456, at 2 (1986)). It imposes civil liability upon anyone who

> knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval [or] knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

> 31 U.S.C. § 3729(a)(1)(A), (a)(1)(B). A "claim" is "any request or demand . . . . for money or property" presented to an

officer, employee or agent of the United States. 31 U.S.C.
§ 3729(b)(2).

The AKS imposes criminal liability on anyone who, <u>inter</u>
<u>alia</u>,

> knowingly and willfully offers or pays any remuneration
> (including any kickback, bribe, or rebate) directly or
> indirectly, overtly or covertly, in cash or in kind to any
> person to induce such person . . . . to purchase . . . . or
> arrange for or recommend purchasing . . . any good . . . .
> for which payment may be made in whole or in part under a
> Federal health care program[.]

42 U.S.C. § 1320a-7b(b)(2).  A violation of the AKS which
results in a federal health care payment is "per se [a] false
claim under the FCA." <u>United States</u> v. <u>Regeneron Pharms., Inc.</u>,
No. 20-11217, 2020 U.S. Dist. LEXIS 227643 at *43 (D. Mass. Dec.
4, 2020) (quoting <u>Guilfoile</u> v. <u>Shields</u>, 913 F.3d 178, 190 (1st
Cir. 2019)).

Private individuals can enforce the FCA as "relators" by
bringing a civil <u>qui tam</u> action in the name of the government.
<u>Millennium I</u>, 923 F.3d at 244.  To bring a <u>qui tam</u> action under
the FCA, a relator must file a complaint under seal, serve the
government with a copy and provide it with all material
evidence. <u>Id</u>.  The government may intervene and proceed with the
action or, if it does not, the relator may serve the complaint
upon the defendant and litigate the action itself. <u>Id</u>.

B. The <u>Qui</u> <u>Tam</u> Actions

    i.   **The Sanborn Complaint**

In October, 2017, relator Sanborn sued Athena in the District of Massachusetts pursuant to the <u>qui tam</u> provisions of the FCA, alleging that Athena, an information technology company which specializes in the provision of healthcare services, had violated the FCA through the marketing and selling of its electronic health record ("EHR") technology.  EHR technology allows health care providers to record patient information electronically and provides essential support to the modern practice of medicine.

Specifically, the relator complaint pled violations of the FCA related to 1) Athena's "client referral incentive program" and 2) the noncompliance of its EHR technology with applicable federal certification criteria.

With respect to the client referral program, the relator complaint alleged that Athena's customers were paid up to $3,000 per physician for referrals of new EHR customers.  It further claimed that Athena provided other "gratuities and incentives" to induce sales of its EHR services, including tickets to sporting events, casino chips, hotel accommodations and meals. The complaint alleged that those payments and incentives violated the AKS and, because the government made payments through Medicaid and Medicare to healthcare providers who became

-4-

Athena clients because of the incentive program, also violated the FCA.

As to Athena's EHR technology, the relator complaint alleged that Athena marketed the technology with a guarantee that it would qualify its customers for incentive payments from the government pursuant to the American Recovery and Reinvestment Act of 2009, Pub. L. 111-5, 125 Stat. 115 (2009). To become eligible for incentive payments, a healthcare provider 1) had to possess certified EHR technology and 2) had to demonstrate meaningful use thereof.  In 2015, the government reduced Medicare payments to healthcare providers who had not adopted certified EHR technology by 1%, followed by 2% and 3% reductions in 2016 and 2017, respectively.

The relator complaint alleged that Athena's EHR technology failed to meet applicable federal certification criteria.  It further claimed that, notwithstanding the failure, Athena deployed its EHR technology and made false representations regarding its compliance with federal regulations.  As a result of those purported misrepresentations, the complaint alleged that Athena customers 1) received undeserved incentive payments and 2) were not penalized for failing to adopt certified and compliant EHR technology.

### ii.   The McKusick and Lovell Complaint

In December, 2017, relators McKusick and Lovell, unaware of Sanborn's complaint which remained under seal, filed a <u>qui tam</u> complaint against Athena.  They alleged that Athena violated the FCA (and similar state statutes) through 1) "systemic, uncorrected flaws" in its billing systems that resulted in the submission of false and fraudulent claims for certain services, including home care services, 2) the failure to report and return the resulting overpayments to the government and 3) violations of the AKS (and similar state statutes) arising from incentive and kickback programs substantially similar those alleged in Sanborn's complaint.

### C. Complaint in Intervention and Settlement

In January, 2021, after several years of investigation, the government filed a complaint in intervention for the limited purpose of entering a settlement to recover damages from false claims submitted by Athena.  The complaint stated that between January, 2014, and September, 2020, Athena maintained three programs through which it paid and provided other benefits to existing and potential clients to induce them to do business with Athena, specifically: 1) its "Concierge Event" program in which existing and potential clients were provided with expenses-paid trips to sporting and other events, 2) its "Client Lead Generation" program in which Athena paid existing clients

for referrals of new medical practices and 3) "Conversion Deals" in which Athena paid competitors who were discontinuing their EHR products to recommend that their clients transition to Athena's product.  The complaint in intervention contained two counts: 1) for violation of the FCA through Athena's use of incentive programs and illegal kickbacks and 2) for unjust enrichment as a result of that wrongful conduct.

Several days later, Athena entered into the Settlement Agreement pursuant to which it paid the government approximately $18 million in exchange for releases of the claims of the government and the relators.  The Settlement Agreement recited the same allegations as the complaint in intervention, albeit in an abbreviated manner.  It provided that Sanborn would receive a relator's share of the $18 million recovered and noted that Sanborn, McKusick and Lovell had come to a private agreement to divide that share among themselves.

## II.  **Motions for Attorneys' Fees and Costs**

Sanborn, McKusick and Lovell have moved for payment of their attorneys' fees and costs by Athena.  Athena does not oppose the motion in concept but does oppose it in amount.

It is axiomatic that

each litigant pays his [or her] own attorneys' fees, win or lose, unless a statute or contract provides otherwise.

<u>Volkswagen Group of America, Inc.</u> v. <u>Peter McNulty Law Firm</u>, 692 F.3d 4, 13 (1st Cir. 2012) (internal punctuation omitted) (citing <u>Hardt</u> v. <u>Reliance Standard Life Ins. Co.</u>, 560 U.S. 242, 253 (2010)). The FCA is one such statute and a relator who recovers damages or settlement proceeds in a FCA action is entitled to receive a relator's share as well as reasonable attorneys' fees, costs and expenses. 31 U.S.C. § 3730(d)(2). Sometimes, as happened here, the government will intervene in a <u>qui tam</u> action but when it does, the relator is still entitled to a percentage of "the proceeds of the action or settlement of the claim" (albeit a smaller one) as well as reasonable attorneys' fees, costs and expenses. 31 U.S.C. § 3730(d)(1).

When multiple relators have filed actions against the same defendant based upon the same underlying facts, the FCA limits entitlement to attorneys' fees and costs to the first relator to file. <u>See</u> <u>United States ex rel. Allstate Ins. Co.</u> v. <u>Millennium Labs., Inc.</u>, 464 F. Supp. 3d 449, 453-54 (D. Mass. 2020) ("<u>Millennium II</u>"). The penultimate sentence of 31 U.S.C. § 3730 (d)(1) provides that

> [a]ny such person shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs.

31 U.S.C. § 3730(d)(1). The phrase "[a]ny such person" refers to the previous sentence of the subsection which sanctions

payment of the relator's share to "a person". Id.   In Millennium I, the First Circuit Court of Appeals ("the First Circuit") held that only the first-to-file relator is "a person" entitled to a relator's share. Millennium I, 923 F.3d at 252.  Accordingly, only that relator may receive an award of reasonable attorneys' fees and costs. See Millennium II, 464 F. Supp. 3d. at 453.

 While a contract may also provide for attorneys' fees, the Settlement Agreement does not. Volkswagen Group of America, 692 F.3d at 13.  Rather, the Settlement Agreement reserves to relators the right to seek fees, costs and expenses under the FCA.  Consequently, relators are entitled to fees and costs either under 31 U.S.C. § 3730 or not at all.

 To calculate reasonable attorneys' fees, courts in this Circuit generally employ the lodestar method. See, e.g., Hutchinson ex rel. Julien v. Patrick, 636 F.3d 1, 13 (1st Cir. 2011).  That method begins with a calculation of total hours worked which is derived from authenticated billing records, reduced by any hours that are duplicative, unproductive or excessive. Gay Officers Action League v. Puerto Rico, 247 F.3d 288, 295-96 (1st Cir. 2001).  The total hours worked is then multiplied by a reasonable hourly rate. Hutchinson, 636 F.3d at 13.  After calculating the initial lodestar figure, the Court has discretion to adjust that figure upward or downward to achieve an equitable result. See Torres-Rivera v. O'Neill-

Cancel, 524 F.3d 331, 336, 340 (1st Cir. 2008), AccuSoft Corp.
v. Palo, 237 F.3d 31, 61 (1st Cir. 2001) (noting that courts
have the ability to "adjust or even deny a contractual award of
fees if such an award would be inequitable or unreasonable")
(internal citation omitted).

### A. McKusick and Lovell

Athena asserts that the first-to-file rule bars McKusick
and Lovell from recovering fees, costs and expenses under the
FCA.  McKusick and Lovell vigorously disagree and contend that
they are entitled to fees, costs and expenses under 31 U.S.C. §
3730 (d)(1) because the government proceeded with their action
and they received a portion of the relator's share, albeit
pursuant to a private agreement with relator Sanborn.

Section 3730 does not sustain the construction which
McKusick and Lovell urge.  It limits entitlement to fees, costs
and expenses to the first relator to file, regardless of whether
the government "proceed[ed]" in more than one action or whether
the plaintiff who received the relator's share subsequently
entered into a private agreement to divide it. See Millennium
II, 464 F. Supp. 3d at 453 (stating that "only a first filer . .
. . can qualify as 'any such person' entitled to fees"), see
also Millennium I, 923 F.3d at 252 (holding that only the first-
to-file relator can claim the relator's share).

Here, McKusick and Lovell were not the first relators to file. In Millennium I, the First Circuit held that the first-to-file rule, 31 U.S.C. 3730(b)(5), bars recovery of a relator's share (and thus an award of attorneys' fees) if the first-filed complaint contains "all the essential facts" of the fraud. Millennium I, 923 F.3d at 254, accord United States ex rel. Batiste v. SLM Corp., 659 F.3d 1204, 1209 (D.C. Cir. 2011) (holding that subsequent filers precluded from recovery where first-filed complaint alleged material elements of the fraud, equipping the government to investigate). That standard does not require "identity between the two complaints" and a later-filed claim may be barred "even if that claim incorporates somewhat different details". Millennium I, 923 F.3d at 254 (internal citations omitted).

To determine whether the first-to-file bar applies, the Court compares the relator complaints, "proceed[ing] claim-by-claim" and limiting the analysis "to the four corners of the relevant complaints". Millennium I, 923 F.3d at 253. Only one claim is relevant here: that Athena violated the AKS, and by extension the FCA, through a variety of programs that provided money and gratuities to induce use of its EHR technology. Id. (citing Rille v. Pricewaterhouse Coopers LLP, 803 F.3d 368, 373 (8th Cir. 2015) (en banc) (stating that a relator seeking recovery must demonstrate a factual overlap between its

-11-

allegations and the conduct discussed in the settlement agreement).

In his qui tam complaint, Sanborn alleged that Athena operated a "client referral incentive program" that offered cash payments or invoice credits to existing customers in order to induce referrals of potential new customers.  Sanborn also claimed that Athena used gratuities such as catered meals, airfare, accommodations and tickets to sporting events to induce the purchase of its EHR technology and provided several examples of the practice.  He alleged that such referral payments and gratuities violated the AKS and, consequently, the FCA.

McKusick and Lovell's complaint contained similar factual allegations.  Relators claimed that Athena provided incentives in the form of invoice credit in exchange for referrals, with the amount of credit increasing with the number of practices or physicians referred.  They described in detail the development of Athena's referral and marketing practices from approximately 2010 to 2017, alleging that the referral program was highly profitable and was substantially expanded over time.

It is apparent from the two qui tam complaints that the relators allege "similar frauds" and that Sanborn's first-filed complaint contained "all the essential facts" of the complaint later filed by McKusick and Lovell. Id. at 253.  Sanborn's complaint provided the government with all the information

necessary to investigate the first and second fraudulent marketing and referral programs two months before McKusick and Lovell filed theirs. See id.  Although Sanborn did not allege facts specifically relating to the third program, i.e. the Conversion Deals, the absence of such allegations is of little benefit to McKusick and Lovell because their complaint was likewise omissive. See id. (requiring allegations more specific than those which could have "arguably . . . . put [the government] on notice" of the particular fraud).  Sanborn, not McKusick and Lovell, was the first-to-file relator and, as a result, McKusick and Lovell are not entitled to fees and costs under § 3730(d)(1). Millennium II, 464 F. Supp. 3d at 453.

The fact that McKusick and Lovell entered into a private agreement with Sanborn pursuant to which they were paid a portion of Sanborn's relator's share does not alter the conclusion.  The relators' agreement cannot, and does not, change the fact that McKusick and Lovell were not the first-to-file relator and thus are excluded from § 3730(d)(1) by the first-to-file bar of subsection (b)(5).  McKusick and Lovell expectantly direct the Court's attention to a recent decision in which the Sixth Circuit held that a relator who receives a portion of a relator's share pursuant to a private agreement may receive an award of attorneys' fees. United States ex rel. Bryant v. Community Health Sys., __ F.4th __, 2022, U.S. App.

LEXIS 2162 at *18-19 (6th Cir. 2022).  This Court has previously held otherwise, see id. (citing Millennium II), and again concludes that recovery of attorneys' fees pursuant to a private agreement would create, in essence, a back door into fees not contemplated by the statute and inconsistent with its text, Congressional intent and First Circuit case law, see Millennium II, 464 F. Supp. 3d at 454.

### B. Sanborn

Athena and Sanborn agree that Sanborn is entitled to reasonable attorneys' fees and costs as the first-to-file relator. See 31 U.S.C. § 3730(d)(1).  They dispute, however, the reasonableness of the amount of claimed fees, costs and expenses, including those which pertain to the preparation of the portions of the complaint alleging EHR compliance violations.  The Court first addresses the EHR compliance claim and then considers the reasonableness of the fees, costs and expenses claimed by Sanborn.

### i. The EHR Compliance Claim

Athena asserts that Sanborn cannot demonstrate that the fees he seeks are reasonable because a substantial portion thereof relates to research and preparation of the EHR compliance claim in which the government did not intervene and on which it recovered nothing.  Athena contends that Sanborn's

fee award must be reduced accordingly and proposes a reduction of 70%.

Sanborn balks.  He stresses that Athena obtained a release of all his claims, including the EHR compliance claim, in exchange for paying a substantial sum to the government, belying the notion that the EHR compliance claim was unsuccessful. Sanborn contends more generally that the FCA does not limit entitlement to fees to those incurred for work on claims upon which the government intervened or even to those upon which the relator prevailed.  Rather, Sanborn submits that the FCA provides for the issuance of fees and costs to a relator who brought an "action" in which the government intervened.

A qui tam plaintiff is entitled to an award of fees, costs and expenses for an action brought under the § 3730(d)(1) only if two related conditions have been satisfied. See Millennium II, 464 F. Supp. 3d at 453-54.  First, in order for the action to come within the ambit of subsection (d)(1), the government must have "proceed[ed] with" it, i.e. intervened in the action. 31 U.S.C. § 3730(d)(1), see id. at 454.  Second, the relator must have received a relator's share pursuant to the resolution of the action. 31 U.S.C. § 3730(d)(1).  A relator's share issues only if the government has intervened and the action has been resolved by settlement or judgment, and only the first-to-file

-15-

relator is entitled to it. See § 3730(d)(1), Millennium I, 923 F.3d at 252.

The EHR compliance claim satisfies neither condition. Sanborn's argument that he is entitled to a fee award under § 3730(d)(1) for both claims because the government intervened and he received a relator's share with respect to one of them is at odds with the manner in which the federal courts of appeals, including the First Circuit, have interpreted § 3730.  Although Sanborn correctly notes that the FCA speaks in terms of "actions" rather than "claims", the draftsmanship of the FCA has its "quirks" one of which is "that the statute is based on the model of a single-claim complaint". United States ex rel. Merena v. SmithKline Beecham Corp., 205 F.3d 97, 101 (3rd Cir. 2000) (Alito, J.).  Notwithstanding the use of the word "action" in § 3730, federal courts of appeals and the United States Supreme Court consistently have understood the statute to refer to a claim rather than the action as a whole. See, e.g id., Rockwell Int'l Corp. v. United States, 549 U.S. 457 (2007).

For instance, the Third Circuit has observed that while § 3730(b)(5) proscribes the filing of subsequent "related action[s]" the first-to-file rule is applied claim-by-claim, see Merena, a conclusion with which the First Circuit is in accord, Millennium I, 923 F.3d at 253 (explaining that "essential facts" test is applied "claim-by-claim").  Similarly and of particular

relevance to the present dispute, both preconditions to a fee award have also been analyzed on a claim-by-claim basis.  With respect to intervention, it is well-settled that the government may intervene only as to some claims in an action brought pursuant to § 3730(b)(1), and that is exactly what happened here.  See Merena, 205 F.3d at 102 (stating that "the government often decides to take over only certain claims in a multi-claim action, and we are aware of no decision holding that this is improper").  With respect to resolution of the action, §3730(d)(1) provides that the relator's share derives from the "proceeds of the action or settlement of the claim". 31 U.S.C. §3730(d)(1), see Rille, 803 F.3d at 373.  Here, Sanborn's share issued from the funds recovered pursuant to the settlement of the AKS claim.

The Court discerns no reason to treat a fee award differently.  There is little statutory basis to suggest that fees, costs and expenses must be reimbursed for the action as a whole while intervention and award of a relator's share, prerequisites to a fee award, proceed claim-by-claim, and such an interpretation would require unwarranted manipulation of the statute.

Finally, to the extent Sanborn contends that he is entitled to fees and costs because the Settlement Agreement released the EHR compliance claim, that argument seems misplaced because it

-17-

concerns awards for "actions" resolved without government intervention. 31 U.S.C. § 3730(d)(2). Because neither party has briefed the issue the Court does not consider it. The Court is in any event unconvinced that a party may recover a fee award absent some showing of success. See Ruckelshaus v. Sierra Club, 463 U.S. 680 (1983) (explaining that the "consistent rule" in federal statutory fee-shifting provisions is that "a successful party need not pay its unsuccessful adversary's fees").

### ii. Reasonableness of Fees and Costs

The Court applies the lodestar method to determine, in the first instance, the fees to which Sanborn is entitled, after which it may adjust that amount upward or downward in the exercise of its discretion. See Torres-Rivera 524 F.3d at 340. That task is complicated by the fact that counsel has not distinguished between time spent on the marketing claims, for which Sanborn is entitled to a fee award, and time spent on the EHR compliance claim, for which it is not. Because the Court cannot determine a principled method by which to include or exclude individual time entries, it will apply an across-the-board reduction after calculating the preliminary lodestar figure.

In that regard, the Court takes the total number of hours worked, subtracts duplicative, unproductive or excessive hours

and multiplies by a reasonable hourly rate. See Gay Officers
Action League, 247 F.3d 295-96.

Sanborn proposes the following hours and rates:

| Experience | Hours Expended | Hourly Rate | Total |
|---|---|---|---|
| 25 years or more | 5.40 | $1,060 | $5,724 |
| 15 to 24 years | 455.30 | $900 | $409,770 |
| 5 to 14 years | 391.50 | $650 | $254,475 |
| 0 to 4 years | 126.25 | $490 | $61,862.50 |

Multiplying the hours expended by the respective hourly
rates and adding the products yields a requested fee award of
approximately $731,000. Sanborn has also claimed approximately
$30,000 of paralegal fees for a total of approximately $760,000.
After abandoning his request for approximately $22,000 in
attorneys' fees related to travel time, Sanborn arrives at his
final claim of approximately $740,000.

Athena attacks various time entries as vague, excessive and
redundant, protests that legal research on unspecified topics
and innumerable meetings were unnecessary and complains that the
unreasonable amount of time preparing the fee petition and
negotiating the relator's share require specific reductions to
the award.

The Court demurs.  Most of the tasks for which relator claims fees were reasonably necessary to further the prospects of the litigation. See, e.g. Equal Employment Opportunity Comm'n v. AutoZone, Inc., 934 F. Supp. 2d 342, 351, (D. Mass. 2013) (allowing for fees for conferencing when time spent doing so was "within reason").  Other tasks pertain to work for which fees are specifically available, such as preparing the fee petition. See Lund v. Affleck, 587 F.2d 75, 77 (1st Cir. 1978) (holding that time spent recovering fees pursuant to a § 1983 action was recoverable).  With respect to specific entries, the claimed time and rates are not unreasonable given the characteristics and duration of the case.

The Court focuses, however, on the matter of the appropriate reduction to impose, considering that Sanborn is not entitled to a fee award for the EHR compliance claim.  It is impossible to ascertain from the time entries how much time was spent on each claim but the Court notes that the EHR compliance claim was substantially more complex than the AKS claim and comprised the majority of the complaint.  Furthermore, the EHR compliance and AKS claims are not substantially interconnected. See Bogan v. City of Boston, 489 F.3d 417, 428-29 (1st Cir. 2007) (explaining that fees are appropriately excluded when "different claims for relief are not interconnected, that is, when the claims rest on different facts and legal theories").

-20-

Although both claims relate to Athena's EHR technology, the AKS claim concerned its sale and marketing whereas the compliance claim was about performance. Id.  Consequently, while both related to alleged violations of the FCA, the operative legal theories were distinct. Id., see United States ex rel. Zediker v. OrthoGeorgia, 407 F. Supp. 3d 1330, 1350 (noting that although "in an FCA action, almost all the claims will involve kickback or billing fraud" that fact alone does not mean that the legal theories are similar).

The Court considers the 70% reduction proposed by Athena unduly harsh.  There is undoubtedly some efficiency gained by the prosecution of two claims pertaining to the same company and the same technology, even if those claims are not substantially interconnected.  Moreover, Sanborn was successful in recovering a substantial sum of money for the government which Athena had acquired through violations of federal law, and a fee award is necessary to vindicate the objectives of the FCA.  Therefore, the Court will reduce the fee award by 50% and award Sanborn attorneys' fees in the amount of $370,000.

Sanborn also claims costs and expenses totaling approximately $15,000.  The Court concludes that he is entitled to those costs and expenses in full because they are reasonable. Furthermore, unlike the claimed fees, costs and expenses, such as data hosting, postage and travel, would not have been

substantially different had the action contained only one claim rather than two.

### ORDER

For the foregoing reasons, the amended motion for attorney fees under the False Claims Act by relators Cheryl Lovell and William McKusick (Docket No. 82) is **DENIED**.

Relator Geordie Sanborn's motion for attorney fees (Docket No. 77) is **ALLOWED**, in part, and **DENIED**, in part.  He is awarded $391,125.33 in fees, costs and expenses.

**So ordered.**


 /s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated:  March 3, 2022